Dale L. HODDER, Respondent
(C3–87–419), Appellant
(C2–87–511),

v.

The GOODYEAR TIRE & RUBBER
COMPANY, et al., Defendants, Petitioners, Appellants (C3–87–419), Respondents (C2–87–511),

Pioneer Rim & Wheel
Company, Respondent.

The GOODYEAR TIRE & RUBBER
COMPANY, Defendant and Third Party
Plaintiff, Petitioner, Appellant (C3–87–419), Respondent (C2–87–511),

v.

REMER OIL COMPANY, INC., Third
Party Defendant, Respondent.

PIONEER RIM & WHEEL COMPANY,
Defendant and Third Party
Plaintiff, Respondent,

v.

ACHESON TIRE COMPANY, Arrowhead
Equipment Company, Itasca Tire Company, Third Party Defendants, Respondents.

Nos. C3–87–419, C2–87–511.

Supreme Court of Minnesota.

May 6, 1988.

Rehearing Denied July 25, 1988.

828

James B. Vessey, Kelley R. Lorix, Timothy E. Branson, Minneapolis, and Randall F. Hendircks, Kirk T. May, Dennis J. Dobbels, Kansas City, Mo., for appellants, Goodyear Tire & Rubber Co. and Motor Wheel Corp.

Paul E. Godlewski, Barna, Guzy, Merrill, Hynes & Giancola, Ltd., Minneapolis, and John C. Risjord, John C. Risjord & Associates, P.C., Kansas City, Mo., for Dale Hodder.

Geoffrey P. Jarpe, St. Paul, for Pioneer Rim & Wheel Co.

Robert J. McGuire, Minneapolis, for Arrowhead Equipment Co.

Phillip A. Pfaffly, Minneapolis, for Itasca Tire Co.

Austin Ditzler, Minneapolis, for Acheson Tire Co.

O.C. Adamson, II, W.D. Flaskamp, Charles E. Spevacek, Minneapolis, for Remer Oil Co.

William P. Studer, Michael Connelly, St. Paul, and Mark S. Anderson, Shirley A. Brantingham, St. Paul, amicus curiae for Minnesota Chamber of Commerce & Industry.

Harry Sieben, Jr., Minneapolis, amicus curiae for Minnesota Trial Lawyers Assn.

Wayne D. Struble, Minneapolis, amicus curiae for Liability Advisory Council and Motor Vehicle Mfrs. Assn.

Victor E. Schwartz, Liberty Mahshigian, Washington, D.C., amicus curiae for Product Liability Advisory Council and Motor Vehicle Mfrs. Assn.

SIMONETT, Justice.

This products liability case raises a variety of issues, including interpretation of the statutory "useful life defense," the duty to warn, and entitlement to punitive damages. Issues on allocation of a tort recovery between the injured employee and subrogated employer, as well as on prejudgment interest, are also presented. We affirm, for the most part, except for a reduction in punitive damages and a remand for reallocation of the tort recovery and readjustment of interest.

On December 19, 1981, plaintiff Dale Hodder, age 17, was seriously injured when the metal rim of a truck tire explosively separated while he was mounting the tire on a customer's logging truck. Hodder was then employed by Remer Oil Company, a service station in the small community of Remer in northern Minnesota. Hodder remembers he was to fix a flat tire on the truck but remembers little else.

The tire that exploded was mounted on a KWX multi-piece rim assembly made by defendant Goodyear Tire & Rubber Company.[1] This assembly consists of a heavy metal rim base, about which the tire with an inner tube is placed, plus a separate metal side ring that attaches to the rim. The rim base is split to facilitate getting the tire on and off; on assembly, the split ends must be carefully realigned and the side ring then fastens to and helps lock the rim base. There were other tires on the truck with an "L-type" rim. The L-type, in contrast with the K-rim, has a solid rim base but the side ring is split.

The K-rim which injured Hodder was manufactured in 1955, 26 years before the accident. The rim was corroded and worn but there was also evidence the component parts were in serviceable condition at the time of the explosion. Goodyear had been making K-rims since the 1920's, and possibly a quarter million are still in circulation. Manufacture of the KWX was discontinued in 1962. After 1955, Goodyear became aware of the danger of pressurized separation of its multi-piece rim asemblies. By the 1970's, Goodyear was using safety films, posters, manuals, advertising, and promotion of OSHA standards to make known information on maintenance and repair of K-rims and to warn about dangers associated with misassembly or use of worn parts. Hodder never saw any of this material.

In 1955, Goodyear was producing and selling K-rims and L-rims. The KWX rim (the kind involved in Hodder's accident) was a K-rim with a lighter rim base, put on the market in 1955, apparently for use, as was the L-rim, for lighter load trucks; however, in later years both the KWX and the L-rim came to be used generally on heavier load trucks. A single-piece rim was invented in 1953 but not until some years later did it gain acceptance in the industry and on the market.

Dale Hodder sued Goodyear and its subsidiary, Motor Wheel Corporation, and the defendants, in turn, brought in Remer Oil Company, plaintiff's employer, as a third party defendant. Remer Oil counterclaimed for benefits it was required to pay for its employee under the Workers' Compensation Act.

During trial, plaintiff dropped its claim of a manufacturing defect. The jury, answering special interrogatories, found no design defect in the K-rim; no negligence on Hodder; 42.5 percent causal negligence each on Goodyear and Motor Wheel, and 15 percent negligence on Remer Oil. Goodyear and Motor Wheel's negligence was found to be for failure to warn. The jury awarded compensatory damages of $3,368,916 and punitive damages of $12.5 million. The jury also found that the "useful life" of the involved KWX rim had expired at the time of Hodder's accident and that Hodder was not negligent in failing to determine that the useful life had expired. Goodyear and Motor Wheel appeal from a denial of their post-trial motions and the judgment, and Hodder appeals the allocation of his tort recovery and an interest item. We granted accelerated review to this court.

## I.

Minn.Stat. § 604.03, subd. 1 (1986), provides that in a products liability action, "it

---

**1.** The flat tire Hodder was to fix was apparently an inner dual wheel. What is uncertain is whether the KWX rim was on the inner or outer dual. The jury could have found the accident happened one of two ways. The first version assumes the KMX rim was on the flat inner dual. Hodder had removed, repaired, and reassembled the flat tire and the repaired tire exploded as Hodder was remounting the wheel to its inner dual position. The second version assumes the KWX rim was on the nonflat outer dual. Hodder had removed this wheel to get at the flat inner dual (which had an L-type rim), and the outer dual wheel exploded as Hodder was remounting it after having remounted the repaired inner dual.

is a *defense* to a claim against a designer, manufacturer, distributor or seller of the product or a part thereof, that the injury was sustained following the expiration of the *ordinary useful life* of the product." (Emphasis added.) Subdivision 2 states, "The useful life of a product is not necessarily the life inherent in the product, but is the period during which with reasonable safety the product should be useful to the user." The subdivision goes on to say this period "shall be determined by reference to the experience of users of similar products," and then lists some of the factors to be taken into account.[2]

In this case the statute was read to the jurors, and, in answer to special questions, the jury found that the K-rim's useful life had expired and Hodder was not negligent in failing to have determined the useful life had expired. In denying Goodyear's post-trial motions, the trial court ruled that the useful life defense was inapplicable because, the jury having found the K-rim was not accompanied by adequate warnings, there never was a period during which with reasonable safety the rim was useful to the user. In other words, by the statute's own definition, the K-rim never had a useful life.

Hodder, of course, agrees with the trial court's ruling. Alternatively, Hodder argues the useful life defense is simply one factor for the jury to consider in determin-ing fault. Goodyear, on the other hand, says the useful life defense is just that, a defense, a complete bar to any injury occurring after the useful life of the product has expired. Both parties select remarks made in the legislative hearings on the useful life defense which support their position. We think the legislative history is inconclusive, but this much is certain: The legislature was concerned about expanding products liability and intended to limit open-ended liability for aging products. The question for us is to what extent that purpose has been accomplished.

Section 604.03 is not a typical statute of repose. A statute of repose starts the limitation period for bringing an action from the date of manufacture or sale of the product, unlike a statute of limitations which starts from the date of injury. A typical statute of repose will specify a presumptive number of years after which an action cannot be brought.[3] Here, however, the limitation period is determined by the trier of fact after injury occurs. The jury makes this determination by "reference to users of similar products," and takes into account, among other things, natural deterioration, progress of the art, climatic and other peculiar local conditions, repair practices, the useful life as specified by the manufacturer, and any user modification.

The statute's useful life concept is ambiguous. It is not clear if useful life refers

---

2. Subdivision 2 of section 604.03 reads in its entirety:

The useful life of a product is not necessarily the life inherent in the product, but is the period during which with reasonable safety the product should be useful to the user. This period shall be determined by reference to the experience of users of similar products, taking into account present conditions and past developments, including but not limited to (1) wear and tear or deterioration from natural causes, (2) the progress of the art, economic changes, inventions and developments within the industry, (3) the climatic and other local conditions peculiar to the user, (4) the policy of the user and similar users as to repairs, renewals and replacements, (5) the useful life as stated by the designer, manufacturer, distributor, or seller of the product in brochures or pamphlets furnished with the product or in a notice attached to the product, and (6) any modification of the product by the user.

3. Six states have useful or anticipated life provisions in their products liability statutes. In five states, the useful life is coupled with a presumptive period (or, in Connecticut, is an exception to a statute of repose) and expiration of the useful life unambiguously bars recovery. Conn. Gen.Stat. § 52–577a (1987); Idaho Code, § 6–1403(2) (Supp.1987); Kan.Stat.Ann. § 60–3303 (1983); Tenn.Code Ann. § 29–28–103 (1980); Wash.Rev.Code § 7.72.060 (Supp.1987). Arkansas explicitly provides that use of a product beyond its "anticipated life" is an element of comparative fault. Ark.Stat.Ann. § 16–116–105 (1987). Minnesota appears to be the only state that simply labels expiration of useful life as a "defense."

One effect of a statute of repose is that it has the potential of barring recovery even before the cause of action accrues. This raises constitutional questions, briefed by the parties, but which we do not reach.

to the life of the particular product involved which caused the injury, or if the life of that particular product is to be measured by the useful life of all like products made by that particular manufacturer, or by the life of some generic product or industry norm. The statute seemingly tries to encompass all three approaches, but this presents problems. The particular product involved in the accident may conceivably have several different life spans depending on which measurement is used.

There are other problems. The statute surely is meant to cover a product originally nondefective but which becomes "defective" with age. But how long must a product last to avoid being labelled originally defective? Does the statute also cover an originally defective product? A product may be defective *ab initio*, but not cause injury until the normal life span of a nondefective like product expires. If these products are not covered, as the trial court ruled, the useful life statute is irrelevant to most products liability claims.

These problems, in turn, raise questions about the role of the user of the product (who may be the owner, a temporary user, or a hypothetical average person) in determining the product's useful life. Hodder points out the useful life definition relies on many of the same factors used to prove design defect, manufacturing defect and failure to warn, with the odd result that the same evidence is used to support a cause of action and to defeat it. Nevertheless, this may be exactly what the legislature intended. But Hodder also seems to say that the useful life defense incorporates a "reasonable person" standard of care, *i.e.*, the defense is not operative unless the plaintiff user knows or should know the product is no longer reasonably safe to use. Goodyear counters by saying section 604.03 must be viewed as a statute of repose, *i.e.*, the defense focuses entirely on the condi-

tion of the product and has "nothing to do with a person's conduct." Further, because the defense applies to "any action," even a user's injury attributable to a manufacturer's failure to warn is barred after the product's useful life has expired.

Notwithstanding Goodyear's claim, it seems to us that section 604.03 does have something to do with the particular person who is using the particular product. Useful life is the period the product is "useful to the user." *Id.*, subd. 2. A factor to be considered is "the policy of the user * * * as to repairs, renewals and replacements." *Id.* Another factor is "any modification of the product by the user." *Id.* A review of the legislative hearings also suggests that the legislature thought the obviousness of a product's deterioration to the particular user might be a consideration in determining useful life.[4] Significant, too, is the fact that the legislature first considered and abandoned a true 15–year statute of repose, H.F. 338, § 3, 70th Legis., 1977 (second House reading, April 18, 1977), and instead adopted a useful life concept derived from a 1977 federal task force study on products liability. *See* U.S. Dept. of Commerce, *Final Report, Interagency Task Force on Product Liability* (1977). The final report, with cursory analysis, endorsed the useful life concept, but the task force's legal study specifically recommended only that manufacturers utilize a notice disclaiming liability for a product after a specific period of time. The legal study contrasted the "useful-life-disclaimer approach" with more "drastic" statutes of repose, reasoning that "[i]f a claim is to be barred before the injury occurs, it seems more equitable to ensure that the employee or consumer knows that he is using the product at his own risk, and that if he is injured, there will be no recovery against the manufacturer." *Id.* at 28–29. Inter-

---

**4.** For example, Senator Spear inquired in committee how the consumer determines when useful life ends, and "what * * * a prudent consumer [does] under this kind of a provision to take reasonable precautions not to use a product when useful life has worn out." (Committee Hearing, Feb. 1, 1978). Senator Davies responded with a hypothetical lawnmower user who allows the muffler to rust off but continues using the mower until he becomes deaf. The user would have no claim for ear damage against the lawnmower or muffler manufacturer. The clear implication is that the deterioration was obvious to the user, who failed to exercise reasonable care in continuing to use the product.

estingly, section 604.03, subd. 2, includes among the factors determining useful life the manufacturer's notice of the product's useful life.

This much is clear. There will be cases where a reasonably prudent user should know a product's useful life has expired and instances where the user has no reason to know nor way of knowing. Goodyear argues that in either case, the user is barred from recovery. We decline to adopt this construction. Expiration of useful life is a defense but we think the legislature has stopped short of saying it is an absolute defense, and it is not for us to take that step, especially in view of the mixed signals given by the statute.

We hold, therefore, that the expiration of a product's useful life under section 604.03 is a factor to be weighed by the jury in determining the fault of the manufacturer and the fault of the user. In other words, the statute emphasizes to the trier of fact the importance, in determining comparative liability, of considering whether the product has outlived its useful life. Section 604.03 should be read to the jury as part of its instructions, perhaps with a prefatory statement that the statutory defense, if found to be applicable, is to be considered, along with other factors, in evaluating the conduct of the manufacturer and the user. There is no need for separate special verdict questions as were given in this case on useful life. The jury's evaluation of the useful life defense will be reflected in its answers to the special verdict questions on fault.

In this case, the jury found, in answer to a superfluous question, that the K-rim's useful life had expired. This answer is not inconsistent with the jury's findings of fault. The jury would have weighed the useful life expiration along with all the other liability aspects of the case in finding Hodder not negligent, Goodyear negligent, and in comparing Goodyear's fault with Remer Oil's fault. This was proper.

How to limit open-ended liability for aging products is perplexing. The useful life approach seems, at first glance, attractive, but as one commentator has noted, on closer study, these statutes "seem incoherent both theoretically and operationally." Schwartz, *New Products, Old Products, Evolving Law, Retroactive Law*, 58 N.Y.U. L.Rev. 796, 848 (1983). Indeed, the author wonders if it is possible to devise a workable repose statute that measures the time period by a useful life concept. It may be that such a statute is feasible, but until that time arrives, the courts apparently, as Professor Schwartz suggests, will simply have to monitor motions for directed verdicts closely in cases of aging products.

## II.

The jury was asked whether Goodyear was negligent because it knew or reasonably could have discovered the danger involved in the use of the KWX truck rim, and the KWX truck rim was not accompanied by adequate warnings. The jury answered the question "yes" and then found this negligence was a cause of Hodder's injuries.[5] Goodyear contends that it had no post-sale, continuing duty to warn; but if it did, it complied with that duty; but in any event any failure to warn was not a cause of Hodder's injuries.

If safety hazards in the use of K-rims did not become known to Goodyear until after 1955, after the K-rim which injured Hodder was made and sold, did Goodyear have a post-sale duty to warn Hodder and other

---

5. Similar questions were submitted for defendant Motor Wheel Corporation and answered affirmatively, the jury then assigning 42.5 percent causal fault to Goodyear and 42.5 percent to Motor Wheel. The defendants argue that because Motor Wheel did not manufacture or sell the KWX rim, it had no duty to warn of the product's danger. Motor Wheel manufactures a variety of wheel products but not K-rims, but it became a wholly-owned subsidiary of Goodyear in 1964 and thereafter handled the marketing of the K-rim. The evidence amply established that Motor Wheel assumed a duty to warn about K-rims, which it shared with Goodyear. We hold the trial court did not err in submitting duty to warn as to Motor Wheel. In this opinion, for brevity, whenever we refer to Goodyear, this includes Motor Wheel, unless the context or text otherwise indicates.

similar users? We have not had occasion to deal with this question before. Jury Instruction Guide 119 says a manufacturer is obligated to keep informed of scientific knowledge and discoveries in its field, and a committee comment states that "the knowledge should be judged at the time the product in question is manufactured." 4 Minn.Dist. Judges Ass'n, *Minnesota Practice*, JIG 119 (3d ed. 1986). Goodyear argues this means post-sale knowledge of danger is not a basis for a duty to warn. JIG 119 seems to be drafted with time-of-sale warnings primarily in mind, but it does not purport to preclude a post-sale duty to warn nor to declare what the law might be on that subject.

■ On the facts of this case, we hold that a continuing post-sale duty to warn existed and was adequately submitted. *Cf. Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959). Hundreds of thousands of K-rims have been used in millions of tire changes over the years without incident; of the 134 or so K-rim explosions which did occur, many are explained by improper servicing or misuse. Goodyear steadfastly maintains its K-rim is a safe product if used properly. Nevertheless, it became evident by the late 1950's that K-rims could be temperamental; that the margin for error in servicing the K-rim assembly was dangerously small and it might explosively separate with seemingly little provocation; that when explosions did occur, serious injury or death usually resulted; and, therefore, that great care was required in the handling and servicing of K-rims. Further, Goodyear has continued over the years in the tire rim business, and, although all K-rim production was discontinued by 1969, Goodyear continued to advertise its K-rims as late as 1977, and has continued to sell tires and tubes for use with used K-rims. Finally, Goodyear undertook a duty to warn of K-rim dangers. Under these circumstances, it seems to us that Goodyear had a continuing duty to instruct and to warn, so that users of used K-rims would be apprised of safety hazards which, at an earlier time, were not fully appreciated. A continuing duty to warn arises only in special cases. We think this is such a case.

■ The trial court instructed the jury, using the JIG instruction, that if there was a duty to warn, "and if the KWX truck rim was not *accompanied* by adequate warnings and instructions, *then* Goodyear/Motor Wheel *is* negligent." (Emphasis added.) This instruction, contends Goodyear, in effect directed a finding of negligence because, admittedly, there was no warning on Hodder's K-rim. In other words, Goodyear construes the word "accompany" to mean the warning must be affixed to or somehow go along with the tire rim. Goodyear argues persuasively that affixing warnings to the rim itself, having in mind the rough wear to which rims are put, was impractical; and, anyway, that the rim injuring Hodder was already in circulation. Moreover, argues Goodyear, the trial court's instruction made irrelevant all the evidence it introduced of its subsequent warning efforts made through safety films, posters, manuals, and advertising. We concede, in the context of this case, that the word "accompany" is inapposite, but we are satisfied that as the evidence was adduced and the arguments were made during this long trial, the jury did not give a narrow, technical interpretation to the court's instruction but understood the warnings, as JIG 119 states, were to be "set out in such a way" as to "catch the attention" of the ordinary user.

Goodyear also says it had no duty to warn because Hodder knew or should have known of the K-rim danger. While Hodder had received training in the servicing of multi-piece rims, his appreciation of the inherent dangers involved was not so perfect as to absolve Goodyear as a matter of law of its duty to warn.[6]

---

**6.** The 1973 Smith internal company report states in part:

In the eyes of the user community, the [K-rim] part is a secondary component. It is a sturdy, heavy part, made of steel. He, there-fore, thinks it has an unlimited useful life.
\* \* \* \*

We have expert knowledge with regard to maintenance. Such information is published, but the information may not reach the in-

Goodyear did, in fact, recognize a continuing duty to warn and, by the late 1970's, before Hodder's accident, it distributed warnings and instructions by means of safety films, posters, manuals, and advertising. The jury, however, could have found that Goodyear's warnings were inadequate to reach K-rim users. We hold the jury's finding that Goodyear was negligent in performing its duty to warn is sustained by the evidence. While a closer question, we also hold the jury could find that breach of this duty was a cause of Hodder's injuries. *Cf. Kallio v. Ford Motor Co.,* 407 N.W.2d 92, 99 (Minn.1987).

### III.

The jury found Remer Oil 15 percent at fault. Goodyear argues that the percentage of fault would have been greater but for erroneous jury instructions. Remer, on the other hand, by notice of review, contends as a matter of law it was not at fault.

■ Hodder may or may not have changed a flat tire mounted on a K-rim, depending on which version of the accident the jury accepted. *See* footnote 1, *supra.* If the K-rim was on the outer, nonflat dual, there was evidence (fresh hammer marks on the rim) indicating Hodder had improperly hammered the rim to return the wheel to the axle. If the K-rim was on the flat inner dual, there was evidence Hodder had improperly serviced the rim. In either event, Remer Oil's negligence in training Hodder was a fact issue. The trial court also instructed the jury, over Goodyear's objection, that Remer Oil's possible OSHA violations were excused if Remer had justification for being unaware of the regulations. This was not error. *See* Restatement (Second) of Torts § 288A (1965). Remer Oil's justification for being ignorant of the OSHA regulations was a fact for the

jury to consider and the jury was not forced, as Goodyear contends, to absolve Remer of liability because it was unaware of the OSHA regulations.

■ We find no error either in various evidentiary rulings challenged by Goodyear. Evidence of 134 post–1955 K-rim explosion accident was offered by Hodder. This evidence was relevant on notice to Goodyear of the K-rim's dangerous propensities and the warnings needed. The fact other accidents may have been caused by misuse does not diminish their relevance on failure to warn. *Cf. Wagner v. International Harvester Co.,* 611 F.2d 224, 230–31 (8th Cir.1979). We think, too, a sufficient foundation for admission of testimony about the other accidents was laid (7 days of pretrial were devoted to foundation), and, while Hodder's expert gave only summaries of the accidents, Goodyear extensively cross-examined the expert using the full files. In admitting the reports of other accidents, the trial court did not exceed its allowable discretion.

■ In 1979 Lynn Bradford, acting director of the Office of Defects Investigation in the United States Department of Transportation, wrote a letter to Goodyear strongly recommending that Goodyear voluntarily recall the remaining K-rims from service. Goodyear considered initiating a recall but then declined, apparently disagreeing whether the K-rim had, as Bradford put it, "an inherent safety defect." The trial court admitted the Bradford letter over Goodyear's objections that it was only Bradford's conclusory opinion, untrustworthy, not a factual finding by the government, and, therefore, hearsay inadmissible under the Minn.R.Evid. 803(8)(C) (1979) exception to the hearsay rule. The jury understood, however, that Bradford's letter was not a formal governmental find-

volved user. If it does, he apparently doesn't see any reason for it. We do not follow up published information with personal contact to show how and the reason why.

We have expert knowledge with regard to serviceability (possibly negative type of knowledge). Such information is not detailed in our publications. The involved user cannot tell a "good" part from a "bad". He

doesn't believe the part won't function (provide support for the tire). He doesn't believe it will endanger him. Even if he feels it is unserviceable, he may not be able to replace it due to owner['s] or his bosses['] instructions; or a replacement may not be available. He may be willing to take a chance because he can't afford a new rim, or he's in a hurry.

ing binding on Goodyear, and we cannot say the trial court abused its discretion in admitting the letter. *Cf. In re Multi–Piece Rims Prods. Liab. Litig. M.D.L. No. 362,* 545 F.Supp. 149 (W.D.Mo.1982) (Bradford letter ruled admissible, under Fed.R.Evid. 803(8), with proper cautionary instructions). We have also reviewed Goodyear's claims of error with respect to admission of OSHA regulations, expert testimony, and the Hodder video tape demonstration of a K-rim explosion, and we find these rulings were within the proper exercise of the trial court's discretion.

### IV.

■ Goodyear challenges the $12.5 million punitive damages award. For there to be punitive damages the defendant must have acted with "willful indifference to the * * * safety of others" and this conduct must be established by clear and convincing evidence. Minn.Stat. § 549.20 (1986); *Gryc v. Dayton–Hudson Corp.,* 297 N.W. 2d 727 (Minn.1980). Because of the open-ended and volatile nature of punitive damages, this court exercises "close control over the imposition and assessment of punitive damages." *Lewis v. Equitable Life Assurance Co.,* 389 N.W.2d 876, 892 (Minn. 1986) (quoting another source). We conclude punitive damages are proper but in a lesser amount.

In *Gryc* we upheld a $1 million punitive damages award against the manufacturer of a highly flammable cotton flannelette, where the manufacturer, even though flame-retardant cotton was available, persisted in marketing its flammable product because it was more profitable. In *Gryc,* then, the willful indifference consisted of continued marketing of a defectively manufactured product. In this case we do not have a defectively manufactured product nor do we have a defectively designed product; rather, the manufacturer's fault here consisted of negligent failure to warn. The question, then, is whether Goodyear's conduct in failing to warn rose to the level of willful indifference.

This is not a case where the manufacturer gave no warnings. Goodyear did warn, and its warning message, insofar as content, was generally adequate. For example, Goodyear's safety film showed a K-rim tire exploding into a dummy figure with every bit as much devastating vividness as Hodder's own video trial demonstration. Goodyear's posters, manuals, and mass mailings told of the dangers and safety measures to be taken. The problem was that these materials received inadequate distribution. Over a 10–year period, for example, it appears Goodyear's sales representative visited only 26 towns in all of northern Minnesota with literature on K-rim dangers. In large part, too, Goodyear left the initiative to tire shops to write in for safety material in response to its ad in trade journals.

So the issue becomes whether Goodyear's inadequate distribution of K-rim warnings was willfully indifferent. By 1962, Goodyear had discontinued production of the KWX and by 1969 it had discontinued production of all K-rims. Goodyear withheld some accident reports and told the Department of Transportation that production had been discontinued for commercial reasons, whereas the jury could have found it was because of growing concern over explosions. In 1972, Goodyear's chairman expressed concern about protecting the tire and tube market which was dependent on multi-piece rims, and K-rims in stock continued to be sold. In 1973, the Smith study reported K-rims were inherently dangerous. Not until 1974–75 did Goodyear undertake a warning program, but then budgeted only about $100,000 a year for this purpose, after company objections "to us[ing] advertising dollars for projects which are not advertising or product promotion." In 1976–77, Goodyear offered a Rim Safety Exchange Program, offering to take in used K-rims on purchase of a new L-rim at a discount, but the discount was unrealistically small; only four K-rims were turned in nationwide and the program was abandoned. In 1979, Goodyear balked at the government's request for a voluntary recall and instead pushed for OSHA

regulations.[7] Not until 1983 did Goodyear have the OSHA regulations in its catalog. While Goodyear itself described the K-rims as dangerous if not used properly, it explained its less-than-efficient distribution of warnings by saying you cannot reach everybody. While Goodyear warned that tire assemblies explode with disastrous effect—a fact not unknown and common to all rims—Goodyear's warnings usually neglected to single out the special hazards of the K-rim. We conclude there was evidence from which the jury could find that Goodyear deliberately downplayed and obscured the dangers of the K-rim to protect its tube and tire sales and thereby exhibited willful indifference to the safety of others.

Goodyear argues that punitive damages were awarded, however, not for failure to warn but for failure to recall, which it says is legally impermissible.[8] "The question," responds Hodder, "is not whether there is a cause of action at common law for failure to recall, but simply whether the failure to give consumer notification as a remedial measure is evidence of a failure to warn and of conduct giving rise to punitive damages." Hodder's point is well taken. Hodder never claimed a recall cause of action nor was any jury instruction given on recall.

Nevertheless, it must be remembered that the jury found the KWX rim not to present an unreasonable risk of harm by reason of design. In other words, the jury found, as of 1955, that neither the regular K-rim, nor the L-rim, nor the single-piece rim, was safer than the KWX.[9] The jury so found even though the L-rim was in regular use in 1955. As for the single-piece rim, its acceptance for heavy load trucks came gradually in later years as development on the larger tubeless tires progressed. Yet, in arguing punitive damages, Hodder argued the K-rim design was defective because both the L-rim and the single-piece rim were safer, and that Goodyear, therefore, should have put out K-rim warnings which said, "Do Not Use This Product."

In view of the finding of a nondefective KWX-rim design, we do not think the evidence is clear and convincing that Goodyear was willfully indifferent in not telling users not to use the K-rim at all. Only to the extent that Goodyear failed to warn users how to use the K-rim was the evidence clear and convincing of willful indifference.[10] Yet Hodder's counsel (who disclaims a recall cause of action) asked the jury (at a time, of course, when the defective design issue was yet unresolved) for $12,500,000 punitive damages based on the cost of recalling 250,000 K-rims at $50 each. The jury awarded $12,500,000. The conclusion is inescapable that the jury awarded appreciable punitive damages on a theory the jury itself had rejected.

---

7. Hodder argues that Goodyear's willful indifference is demonstrated by its "pressure" on OSHA to adopt safety regulations, so that the "liability onus" would be transferred to service personnel. We would think campaigning for OSHA regulations shows the opposite of indifference. Goodyear's indifference lies, rather, in assuming OSHA's program absolved it of pursuing a vigorous warning program of its own.

8. Goodyear contends there is no common law duty to recall, citing *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 135 (8th Cir.1985), and hence recall affords no basis for awarding punitive damages; further, in any event, that a punitive damages award based on recall is preempted by the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1381 et seq. (1982). We need not reach this issue.

9. The trial court's instruction on defective design followed JIG 117, and required the jury, among other things, to balance "the likelihood of harm and the seriousness of that harm against the feasibility and burden of any precautions which would be effective to avoid the harm," and, to consider in the final balance, among other things, "[t]he availability of other and safer products to meet the same need."

10. The issue here is not which kind of rim was better, but whether, if one rim was better, Goodyear was willfully indifferent, not only in failing to warn about the less safe rim, but in not withdrawing it for the more safe rim. Between 1955 and 1981 there was a gradual evolution in the relative merits of the various rims involving many complex considerations. Against this background and the jury's finding that the K-rim was not defectively designed, Goodyear's election not to recall used K-rims cannot be said to be willful indifference which meets the higher clear and convincing standard of proof.

We are persuaded, therefore, that the award of punitive damages cannot stand because of obvious error in the jury's calculations. We also conclude that justice is best served by reducing the punitive damages rather than by granting a new trial. *See Stanger v. Gordon*, 309 Minn. 215, 222, 244 N.W.2d 628, 632 (Minn.1976) (reduction rather than new trial given). When, as here, the issues of liability and compensatory damages have been fairly tried and need not be tried again, we would not want to grant a new trial on all issues; and we hesitate to grant a new trial on punitive damages alone, where the evidence of fault, now established, is yet again exhaustively presented to decide only the egregiousness of that fault. Furthermore, punitive damages do not "belong" to the plaintiff in the same sense as compensatory damages. Punitive damages are to punish the defendant, not compensate the plaintiff who has already been compensated. Indeed, some argue that the public should have more of a claim to collect a punitive award than the plaintiff. In any event, it is because of the unique, public aspect of punitive damages that the court exercises a much closer supervision over these awards than is the case with compensatory awards.

In determining the reduction, we look for proportionality between the egregious misconduct and the amount of damages, keeping in mind "those factors which *justly bear* upon the *purpose* of punitive damages." Minn.Stat. § 549.20, subd. 3 (1986) (emphasis added). Here, first of all, the award must be substantially discounted for the erroneous per-rim recall calculation. Secondly, while the focus is on the dangerous propensity of the K-rim to explode, the egregious misconduct must, under the jury's findings, be restricted to the inadequacies of the warnings; the product itself, it must be remembered, was found not defective, neither in design nor manufacture, nor was there a complete failure to warn. It appears that the jury, in punishing the defendant, may have included factors not "justly bearing" on punitive damages. Finally, the purpose of punitive damages needs to be kept in mind, namely, to punish and deter the conduct found to be willfully indifferent to the safety of others. We conclude, in this case, that an appropriate punitive damages award should be $4 million. The award, therefore, is reduced from $12.5 million to $4 million.

## V.

Minn.Stat. § 176.061, subd. 6 (1981), divides a plaintiff employee's tort recovery between the employee and his employer roughly as follows: After deduction of expenses of collection, one-third is paid to the employee outright; the remainder is to reimburse the employer for compensation paid; and any balance remaining thereafter goes to the employee but with a credit to the employer against future compensation payable. Hodder challenges the trial court's application of the subdivision 6 formula to his recovery of compensatory damages. The parties agree punitive damages go to the employee outside the formula.

Under subdivision 7 of the statute, the employer has "a separate additional cause of action" against the third party tortfeasor for past and future medical expenses. Here Remer Oil was awarded $1,238,916 for past and future medical expenses and the trial judge excluded this sum from the subdivision 6 formula. Hodder claims this sum should have been included. We agree.

We have previously recognized the special, independent nature of the employer's statutory cause of action for medical expenses under subdivision 7. *See Travelers Ins. Co. v. Springer*, 289 N.W.2d 131, 133 (Minn.1979); *see also Metropolitan Transit Comm'n v. Bachman's*, 311 N.W.2d 852, 854 (Minn.1981). Under *Springer*, we held the employer's third-party claim for medical expenses exists when the employee is unable to sue the third party because the employee cannot meet the threshold requirements of the no-fault act for a tort action.

If the subdivision 7 action could be limited to medical expenses, the direct recovery Remer Oil urges might be appropriate as a

narrow exception to the general application of the subdivision 6 formula.[11] In 1983, however, the legislature expanded subdivision 7 to cover not just medical expenses but "other compensation payable." 1983 Minn. Laws ch. 290, § 35. By this amendment, the legislature meant to extend *Springer* to insure the employer's right to recover nonmedical compensatory benefits as well as medical expenses in instances where the employee's right to recover tort damages is barred by the no-fault act. *Allstate Ins. Co. v. Eagle–Picher Industries, Inc.*, 410 N.W.2d 324, 326–27 (Minn.1987). We recognize, of course, that the 1983 amendment does not govern Hodder's case, but if the pre–1983 statute is construed to exclude medical expenses from the subdivision 6 formula, it follows that the amended statute, in other cases, must exclude other compensation payable as well as medical expenses. Employers could in the future entirely bypass the subdivision 6 allocation by suing out their "separate additional" cause of action; if the subdivision 6 formula does not apply to any of the employer's subrogation interest, the employee would no longer be assured of at least recovering for himself one-third of the tort recovery after expenses. Nor would employers have to share equitably in the employee's cost of recovery. We think this result is neither desirable nor was it intended.

■ We hold, therefore, that when, as here, the employee's tort action includes medical expenses separately asserted by his employer, nevertheless, the employer's recovery of medical expenses is subject to the subdivision 6 formula. This result respects the allocation of employer and employee rights inherent in the statutory scheme of section 176.061. In those instances where the employee does not or cannot maintain a third-party action, subdivision 7 continues to give the employer, as in *Springer*, the right to recover its benefits paid and payable. So, in this case, the entire $3,368,916 compensatory award is subject to allocation under section 176.061, subd. 6.

After calculating Hodder's attorney fees for the compensatory award,[12] the trial judge excluded costs taxed to Goodyear ($52,372.41) and prorated the remaining collection costs to exclude costs attributable to recovery of punitive damages. Exclusion of costs taxed to Goodyear was proper as Hodder did not have to pay them. Prorating the other legal costs was, however, incorrect, as we do not believe costs expended for establishing punitive damages and those for compensatory damages can be realistically separated in this case.

■ Under the subdivision 6 formula, after the employee receives his one-third share of the tort recovery outright, the employer is entitled to reimbursement for compensation benefits already paid from the remaining balance. Ordinarily, this reimbursement is reduced by an amount representing the employer's proportionate share of the costs of the tort recovery.[13]

11. The subdivision 7 medical expense action was enacted in 1953, 1953 Minn.Laws ch. 755, § 6. Apparently the legislature was then reacting to *Dockendorf v. Lakie,* 240 Minn. 441, 61 N.W.2d 752 (1953), which had allowed the compensation insurer to recover its subrogation claim for benefits and medical expenses out of plaintiff employee's general, unsegregated verdict against the third-party tortfeasor. *See also* the follow-up opinion, *Dockendorf v. Lakie,* 251 Minn. 143, 86 N.W.2d 728 (1957). Since then the third-party action has been further modified and the current subdivision 6 allocation formula added. Over the years, except for *Springer,* the nature of the subdivision 7 action has not been examined and, in practice, has been treated ambivalently.

12. Because we hold the entire compensation award is subject to distribution under subdivision 6, Hodder's attorney fees should be calculated for formula purposes from that amount rather than from the nonmedical compensatory award as in the trial court's calculation.

13. Subdivision 6(c) calculates the amount of reduction of the employer's reimbursement for costs of recovery as follows:

$$\frac{\text{cost of collection under subd. 6(a)}}{\text{total compensatory award}} \times \frac{\text{workers' compensation benefits paid by employer}}{} = \frac{\text{amount of reduction}}{}$$

Apparently because Remer Oil hired its own attorneys to represent its subrogation interests throughout the trial, the trial court did not reduce Remer Oil's reimbursement by its proportionate share of the employee's costs. This was incorrect.

Frequently, the plaintiff-employee conducts the entire tort litigation and the employer either does not have an attorney or its attorney does little or nothing to assist in the tort recovery. In such instances, we have said it is equitable for the employer, who is being reimbursed, to share part of the employee's collection costs. *Cronen v. Wegdahl Coop. Elevator Ass'n,* 278 N.W. 2d 102, 104 (Minn.1979). The equities are less clear where, as here, the employer's own attorney presents the employer's subrogation claim. Under a former version of subdivision 6, this court refused to make an employer "pay twice for its recovery of the subrogated interest" when the attorneys had agreed in writing that the employee's attorney did not represent the employee's interest and each attorney reached a separate settlement with the third party tortfeasor during joint negotiations. *Anderson v. Twin City Lines,* 289 Minn. 11, 16, 182 N.W.2d 193, 195 (1970). This case falls somewhere between *Cronen* and *Anderson.* While Remer Oil's attorney actively participated in the trial, he was partly defending against Goodyear's claim for *Lambertson* contribution. Also, Remer Oil's subrogation recovery depended heavily on Hodder's efforts, as indicated by Hodder's trial expenses of over $173,000 to Remer Oil's expenses of about $12,500. Moreover, the record shows no agreement between Remer Oil and Hodder on relative litigation responsibilities or allocation of fees and costs, although it occurs to us such agreements might be useful. On these facts, we think the equities lie with the employee and there is no justification for straying from the statutory formula which is intended "to ensure that those benefited by the recovery share equitably in the cost of obtaining that recovery." *Cronen,* 278 N.W.2d at 104. Remer Oil's reimbursement should be reduced by its share of the collection costs calculated under subdivision 6(c).

There is one last subdivision 6 correction. Any balance remaining after the employer's reimbursement "shall be paid to the employee or his dependents and shall be a credit to the employer" for benefits the employer has to pay in the future. The trial court assigned the full balance as Remer Oil's credit. We have previously held, however, that this balance must also be reduced by the employer's proportionate share of collection costs calculated by the ratio used in subdivision 6(c). *Kempa v. E.W. Koons Co.,* 370 N.W.2d 414, 420 (Minn.1985); *Kealy v. St. Paul Hous. & Redevelopment Auth.,* 303 N.W.2d 468, 475 (Minn.1981). The trial court erred in omitting this step.

## VI.

Preverdict interest on pecuniary damages "shall be computed * * * from the time of the commencement of the action * * * except as provided herein." Minn. Stat. § 549.09, subd. 1(b) (1984). One of the exceptions is the offer-counteroffer provision. Under this provision, if the winning party's settlement offer proves to be closer to the judgment than the losing party's, the winning party gets preverdict interest from the start of the lawsuit. But if the losing party's offer is closer, the losing party pays less preverdict interest.[14]

---

14. Minn.Stat. § 549.09, subd. 1(b) (1984), provides in relevant part:

(b) Except as otherwise provided by contract or allowed by law, pre-verdict or pre-report interest on pecuniary damages shall be computed as provided in clause (c) from the time of the commencement of the action, except as provided herein. If either party serves a written offer of settlement, the other party may serve a written acceptance or a written counter-offer within 60 days. After that time interest on the judgment shall be calculated by the judge in the following manner. The prevailing party shall receive interest on any judgment from the time the action was commenced * * * until the time of verdict or report only if the amount of its offer is closer to the judgment than the amount of the opposing party's offer. If the amount of the losing party's offer was closer to the judgment than the prevailing party's offer, the prevailing party shall receive interest only on the

Goodyear challenges the trial court's application of the offer-counteroffer provision.

On November 14, 1984, Hodder wrote Goodyear, claiming his compensatory damages alone, excluding punitive damages, were over $7.5 million and making a settlement demand of $7,507,522. Goodyear asked for clarification, including whether the demand figure included Remer Oil's workers' compensation subrogation claim. On December 27, 1984, Hodder confirmed by letter that its demand included Remer Oil's claim and insisted that it had a right to so claim. On February 11, 1986, Goodyear responded by letter, pointing out that Remer Oil had not joined in Hodder's demand and offered to settle Dale Hodder's claim under a *Naig–Pierringer* release for $750,000. Hodder argues Goodyear's counteroffer was untimely, not given within 60 days of his November 14 demand. Goodyear denies untimeliness and says its offer was closer to the $3.3 million compensatory verdict. Hodder, in turn, says his demand of $7.5 million was closer to the total judgment which included punitive damages. The trial court awarded Remer Oil prejudgment interest on its medical expense recovery from the date of commencement of the lawsuit and similar interest to Hodder on his nonmedical compensatory award. We affirm preverdict interest on the entire compensatory judgment but our analysis differs from that of the parties and the trial court.

Valid offers and counteroffers under section 549.09 must be in writing and must offer, in sufficiently clear and definite

terms, to dispose completely the claims between the negotiating parties. The statute aims to promote settlements and this is best accomplished by offers which are straightforward and would in an effective and practical manner settle matters between the negotiating parties. Having said this, we recognize section 549.09 is ill-adapted to multi-party lawsuits,[15] particularly a plaintiff-employee's action against a third-party tortfeasor.

Here, Hodder has a personal injury claim. Remer Oil has a claim too, a special claim for workers' compensation paid and credit for compensation yet to be paid, recoverable out of the tort recovery, enforceable by a statutory right to intervene, yet subject to the subdivision 6 formula. Remer Oil also has an interest in defeating the third-party tortfeasor's counterclaim for *Lambertson* contribution which would diminish its subrogation recovery. It is evident that Remer Oil's subrogation claim cannot be a realistic candidate for settlement offers and counteroffers unless included within Hodder's settlement offer or unless Hodder has first settled his own claim separately on a *Naig* release. As a practical matter, Remer Oil's interests are inextricably intertwined with Hodder's interests, and Hodder controls the settlement initiatives.[16] We hold, therefore, that in an employee's third-party tort action, for the purposes of the offer-counteroffer provision of the prejudgment interest statute, any offer must treat the employee and the employer as one party, and any settlement

---

amount of the settlement offer or the judgment, whichever is less, and only from the time the action was commenced * * * until the time the settlement offer was made. * * *

This law became effective July 1, 1984, with interest accruing from that date in any pending cause of action. 1984 Minn.Laws ch. 472, § 2.

**15.** *See* Note, *The Minnesota Prejudgment Interest Amendment: An Analysis of the Offer–Counteroffer Provision,* 69 Minn.L.Rev. 1401 (1985). Indeed, the note goes so far as to say it is arguable whether the offer-counteroffer provision applies to any actions involving more than two parties. *Id.* at 1425. We decline to take this route, although the legislature may perhaps wish to review the matter. Whether the offer-counter-

offer device, requiring parties to take formal, fixed positions and gamble on which position will be closer to the final result, actually promotes settlements is perhaps another arguable proposition, but not one for us to answer.

**16.** For example, *see Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 257 N.W.2d 679 (1977), and *Naig v. Bloomington Sanitation,* 258 N.W.2d 891 (1977), and their progeny. Because of the substantial conflict of interest between the employee and the employer, counsel for the plaintiff employee cannot presume to speak for the employer's subrogation claim. *See, e.g., Easterlin v. State,* 330 N.W.2d 704 (Minn.1983); *Quarberg v. Laundry Store Sales, Inc.,* 269 Minn. 213, 214, 130 N.W.2d 340, 342 n. 1 (1964).

offer, to be valid, must encompass the interests of both the employee and the employer. This makes good sense. It requires, in the spirit of the statute, that settlement offers be made that will dispose of the entire claim against the third-party tortfeasor. True, the employee and employer may disagree on how to divide the settlement recovery between them, but this need not prevent them from agreeing on an aggregate settlement offer or counteroffer to present to or accept from the third party.

In this case Hodder did offer to settle both his claim and Remer Oil's claim for $7.5 million. Nevertheless, his offer was invalid because Remer Oil, apparently pursuing its own strategies, never joined in that demand. Goodyear was not required to respond to an offer where the offerors were not in agreement. Neither was Goodyear's offer of $750,000 to settle with Hodder, exclusive of Remer Oil's interest, a valid offer. While *Naig* settlements are appropriate, this piecemeal kind of settlement does not meet the requirements for a valid offer under section 549.09. For example, to what "judgment" must Goodyear's $750,000 offer be closest? And what if Hodder and Remer Oil had responded to Goodyear's $750,000 *Naig* offer with a valid offer to settle their joint interests for $7.5 million? The offer-counteroffer provision of section 549.09 cannot function with offers which are not responsive to each other.[17]

We hold that no valid offer or counteroffer was made by any party in this lawsuit. Consequently, Goodyear must pay preverdict interest on the entire compensatory judgment.[18] Goodyear seems to argue that if *the claimant* makes no settlement offer, there can be no preverdict interest. This is incorrect. The general rule laid down by section 549.09 is that preverdict interest is computed from the time the action is commenced *unless* the offer-counteroffer exception applies. No offers having been made, the exception does not apply, and the general rule governs.

Finally, the clerk neglected to tax interest on punitive damages from the date of the verdict. This should have been done. Minn.Stat. § 549.09, subd. 1(a) (1984). On remand, the clerk should add postverdict interest on the punitive damages award as reduced.

## VII.

The judgment and orders appealed from are affirmed, except the case is remanded (1) to reduce the punitive damages award to $4,000,000; (2) to recalculate the allocation of the compensatory award between the employee and the employer under Minn.Stat. § 176.061, subd. 6, in accordance with this opinion and to revise the judgment (with preverdict interest on the whole thereof) accordingly; and (3) for the clerk to add postverdict interest to the punitive damages awarded.

---

**17.** We should not be understood as saying that there must always be a counteroffer to activate the offer-counteroffer provision of the prejudgment interest statute. If, in this case, Goodyear had served an offer on Hodder and Remer Oil to settle their aggregate interests for a specific sum, that would have been a valid offer, and, if Hodder–Remer Oil had not responded with a valid offer, Goodyear's offer would stand alone and activate the preverdict interest reduction.

The court of appeals in *Kulkay v. Allied Central Stores*, 398 N.W.2d 573, 578 (Minn.App. 1986), held that the offer-counteroffer provision applies only if both parties make valid offers. We disagree. The provision applies whenever one party serves a valid offer. If the other party fails to respond or the response is invalid, the valid offer by default is closer to the judgment. This interpretation is borne out by the statute which says, *"[i]f either party* serves a written

offer of settlement, the other party *may* serve a written acceptance or a written counter offer within 60 days." (Emphasis added.) If the purpose of the statute is to promote settlements, this is best accomplished by penalizing the party who fails to respond to a settlement overture or who makes an invalid offer.

**18.** The statute does not allow preverdict interest on punitive damages, and, quite correctly, no claim for such interest has been made by Hodder.

Minn.Stat. § 549.09 was amended by 1986 Minn.Laws ch. 455, § 81 to bar preverdict interest on "judgments for future damages." This amendment does not "clearly manifest" an intent to be applied retroactively, and we hold it does not have retroactive effect. *See* Minn.Stat. § 645.21 (1987).

Affirmed in part, reversed in part, and remanded with directions.

COYNE, J., took no part in the consideration or decision of this case.

## ORDER

This court, having considered en banc the petitions for rehearing in the above entitled case,

IT IS HEREBY ORDERED:

1. In its petition for rehearing, Goodyear Tire & Rubber Company (as one of its arguments) calls our attention to an amendment to Minn.Stat. § 549.09, the pre-verdict interest statute, enacted by the 1988 legislature, effective April 13, 1988 "to all cases then pending." *See* 1988 Minn.Laws ch. 503, § 6. The "cases then pending" provision means that the 1988 amendment to subdivision 1, which relates only to the rate of interest, was to be effective April 13; contrary to Goodyear's contention, the "pending" language has no effect on the remainder of subdivision 1 allowing pre-verdict interest which was already in force and was left undisturbed by the 1988 amendment.

2. In all respects, the petitions for rehearing of Goodyear Tire & Rubber Company, Motor Wheel Corporation, and Remer Oil Company are denied and stay vacated.

3. No award of attorney fees pursuant to Minn.R.Civ.App.P. 140.03 is allowed.

4. The taxation of costs and disbursements by Goodyear Tire & Rubber Company and by Dale L. Hodder are hereby denied.

COYNE, J., took no part in the consideration or decision of this case.