## ANNA OTTO v. CHARLES T. MILLER HOSPITAL.

115 N. W. (2d) 36.

April 27, 1962—No. 38,413.

*James G. Paulos,* for appellant.

*Richard J. Leonard, John L. Hannaford,* and *Doherty, Rumble & Butler,* for respondent.

NELSON, JUSTICE.

Plaintiff, Anna Otto, brings this action for damages for alleged defamation. In her amended complaint she alleges that defendant, Charles T. Miller Hospital, a corporation in St. Paul, Minnesota, with the intent and willful design to injure plaintiff, through its employees uttered slanderous statements in the hearing of others to the effect that she was an arsonist, causing fires in defendant hospital. Plaintiff claims that be-

cause of said slanderous statements she has suffered humiliation, mental anguish, and ridicule, as well as loss of her employment. Plaintiff alleges both special and general damages.

The matter was tried before a jury, and at the conclusion of all the evidence, the trial court directed a verdict for defendant. Plaintiff appeals from an order denying her motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial.

Prior to the termination of her employment in February 1959, plaintiff had been employed by defendant hospital for 8 years as a cleaning woman. On February 15, 1959, she reported for duty at 7 a. m. Later that day two fires broke out while plaintiff was working on Floor 2-B. The first one broke out in the morning in the broom closet or brush room; the other occurred in the afternoon in a bathroom on the same floor. The St. Paul Fire Department was called and assisted the porter in putting out the first fire. The second fire was put out by two orderlies and a nurse, each using a fire extinguisher. The first fire blackened the walls of the broom closet and burned a hole by the shelves. The second fire resulted in clouds of smoke darkening the bathroom walls.

William N. Wallace, the hospital administrator, was notified of both fires and went to the hospital after each occurrence. He observed after the second fire that patients who weren't supposed to be out of bed were milling about and that hospital personnel appeared to be very jittery. Due to his observation, he asked three or four trusted employees to come down and set up an informal fire watch so that the patients would feel their interests were being protected, and if the fires were incendiary, the presence of the fire watch might be a deterrent. These employees remained on duty as a fire watch during the entire night.

State law requires that the fire department investigate all fires where there is damage in excess of $25. Minn. St. 73.03. As a result, the arson squad, consisting of a Mr. Zenke of the St. Paul Fire Department and a Mr. Grossman from the National Bureau of Fire Underwriters, arrived at defendant hospital to conduct an investigation of the fires. The hospital did not request that such investigation be made. Accordingly, it was made as a part of the routine duty of the arson

squad of the fire department. No one from the hospital interrogated plaintiff about the fires in any way until she was discharged.

Because of the two fires occurring on the same floor, on the same day, Mr. Zenke of the arson squad was suspicious that the fires were not accidental and, as a part of the investigation, interviewed hospital visitors and hospital employees, including plaintiff, who was in the vicinity of both fires when they broke out. All questioning of plaintiff was conducted by the arson squad. Because of her being in close proximity to the fires, she was asked to take a lie detector test. This she refused to do unless other employees of the hospital were willing to do the same. After completing the investigation, the arson squad made a written report, submitting one copy to the Ramsey County Attorney's office and one copy to defendant hospital. According to the report, the investigators reached the conclusion that these fires were possibly incendiary and that plaintiff was suspected.

After the hospital had received the report from the arson squad the hospital administrator notified Mr. Ebb, Director of General Services at the hospital, to allow plaintiff to resign or discharge her immediately. On Friday, February 20, Mr. Ebb called plaintiff to his office and an interview followed. Plaintiff claims that the defamation of her character occurred during that interview.

When plaintiff answered the call to Mr. Ebb's office for the interview on February 20 she was alone, but when advised that she would either have to resign or she would be discharged, she went out and brought back Cecilia Razook, the union steward at the hospital. Since it was at this meeting that plaintiff claims the alleged defamation took place, it is pertinent to consider the testimony of those present as to what they understood the alleged slander to be. Plaintiff testified as follows:

"Mr. Paulos [plaintiff's attorney]: Mrs. Otto, we want to get the exact words as far as you can remember, of what Mr. Ebb told you when you were in his office with Cecilia Razook, about why they were discharging you.

"A. On account of the fires and the report from the arson squad, but what was on that paper he did not say.

"Q. But he did say because of the fires?

"A. Yes."

Cecilia Razook testified as follows:

"Q. Was anything said at that time why she was being discharged?

"A. Yes, they said they had received the arson squad and they suspected her. She was on suspicion or something to that effect."

Mr. Ebb testified as follows:

"Q. But you did have suspicions that Mrs. Otto may have been the one who was responsible?

"A. On the basis of the reports given to us by the Fire Department, that's correct.

"Q. And because of that report you called her in your office and had some discussion with her?

"A. That's right.

"Q. Was it on two occasions, as Miss Razook stated?

"A. I believe on Friday morning after we got the report from the Fire Department Mr. Howland and myself asked her to come in my office, and it was at this time we told her that on the basis of the report from the Fire Department we would have to discharge her if she didn't resign, and she left then and came back later with Cecilia Razook."

Plaintiff's employment was terminated by Roger F. Howland, personnel director of defendant hospital, by letter dated February 23, 1959, the contents of which are as follows:

"This is to confirm your termination by Mr. Ebb, Director of General Services, effective February 20, 1959. Your final paycheck will be prepared immediately and mailed to you at your home."

Plaintiff in her assignments of error contends that the trial court erred (1) in failing to grant plaintiff's motion for a new trial, or, in the alternative, judgment notwithstanding the verdict; (2) in granting a motion of defendant to amend its answer and denying a motion by plaintiff to amend her complaint; (3) in its ruling which permitted defendant to get into evidence matters of hearsay, immateriality, irrelevancy, and conclusions of fact not based upon reasonable findings upon which the conclusions could reasonably be based.

We have carefully considered plaintiff's first and second assignments of error in connection with the entire record herein and conclude that they are without merit. The matter of granting or denying motions to amend pleadings is largely discretionary with the court. There has been no abuse of discretion here. Plaintiff's third assignment of error is clearly without merit. She has in no way shown in what respect the trial court erred in its evidentiary rulings. There is no specific reference to the evidentiary rulings of which she complains such as the rules of this court require.

The gist of plaintiff's appeal is summed up in the contention that the words spoken in the presence of a third party in the instant case constituted actionable slander. It appears to us that no malice has been shown such as would be essential to plaintiff's cause of action, nor has it been shown that defendant through its personnel or employees accused the plaintiff of arson. The record indicates that the necessary publication of the alleged slander was made in the presence of Cecilia Razook, the union steward who, at plaintiff's request, attended the meeting which resulted in the plaintiff's being later discharged. She had come for the sole purpose of listening to the allegations against plaintiff.

The fires had created unusual disturbances among the patients as well as the personnel at the hospital. The hospital had a duty to take proper notice of the report of the arson squad and was required to deal with the fire hazards immediately and summarily. Hospital authorities must follow certain standards to protect their patients from natural disasters and, when the arson squad reported to the hospital the results of their investigation concluding that plaintiff was a possible suspect, the hospital authorities did the thing they were required to do and the only possible thing they could do under the circumstances.

Defendant hospital did not discharge the plaintiff until after she refused to take a lie detector test which the arson squad members had suggested. Everything was done on the part of everyone concerned, including the hospital officials, as discreetly as the circumstances then permitted. Plaintiff has not suggested in the instant case any other procedure defendant could have followed.

■ We think that the present case is controlled by the rules stated

in Hebner v. G. N. Ry. Co. 78 Minn. 289, 80 N. W. 1128. The plaintiff in that case was discharged after he had been insolent and abusive to defendant's patrons. It was the defendant's custom to keep a file on its employees, and the fact that plaintiff had been abusive and insolent to patrons was entered on plaintiff's "service card" as the reason for his discharge. The trial court found that there had been a sufficient publication regarding Hebner's insolent and abusive attitude by the reading of the written record on the service card in the presence of clerks in the superintendent's office. The trial court, however, concluded that even though the words were published in the foregoing manner (78 Minn. 295, 80 N. W. 1130) "that the evidence fails to show want of probable cause such as would justify a reasonably prudent man in making the entry, and that the fact of malice, essential to plaintiff's recovery, was not established."[1] On appeal, this court affirmed the trial court.

It became established law by the ruling in the Hebner case that (78 Minn. 292, 80 N. W. 1129) "a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover."

■ We find nothing from a reading of the record in the instant case which, taken by itself, would tend to show that defendant hospital did not have probable cause to believe the charges to be true, under all the circumstances, especially in view of the fact that plaintiff refused to follow the suggestions of the members of the arson squad and take a lie detector test. A willingness to do that very thing on her part might well have reflected credit upon her and relieved the hospital officials and personnel of the embarrassing position in which they had been placed and the necessity of acting summarily as they did. We think it has been established conclusively that there was no wanton disregard of plaintiff's feelings or welfare and that since the communi-

---

[1]See, Otten v. Schutt, 15 Wis. (2d) 497, 113 N. W. (2d) 152.

cation was of a privileged character and was made on a privileged occasion only, the prima facie effect was to rebut the element of malice and to cast upon plaintiff the necessity of showing malice in fact; that is, that the defendant hospital acted with ill will or with a design to injure plaintiff. We think that the communication was privileged because it was made upon a proper occasion, proceeding from a proper motive, and was essentially based upon reasonable or probable cause.

It is pointed out in 1 Harper & James, Law of Torts, § 5.17, that:

"Ordinarily the consent of the plaintiff to the publication of defamatory matter, or to the presence of a third person when he had reason to expect such a publication about him, is a complete bar to any action against the publisher. This is the application of the general principle of the law of torts that consent to intended invasions of the plaintiff's interest is not a wrong as to him."

A similar position is taken in Restatement, Torts, § 583:

"Except as stated in § 584, the publication of false and defamatory matter of another is absolutely privileged if the other consents thereto."

*Illustration* 2 in the Restatement gives this example:

"A, a school teacher, is summarily discharged by the school board. He demands that the reason for his dismissal be made public. B, president of the board, publishes the reason. A has consented to the publication though it turns out to be defamatory."

The trial court in a well-reasoned memorandum attached to and made a part of its order from which this appeal is taken reached the conclusion that plaintiff has failed to show want of probable cause on the part of defendant hospital and to establish the element of malice essential to her recovery.

We conclude that the trial court's order finds ample support in the record and should be affirmed.

Affirmed.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.