The ESTATE OF Olive E. HARTZ, Shirley J. Arms, individually, and as Personal Representative of the Olive E. Hartz Estate, et al., Respondents,

v.

James J. NELSON, Appellant.

No. CX–88–1061.

Court of Appeals of Minnesota.

April 4, 1989.

Steven H. Caldis, St. Paul, for respondents.

James J. Nelson, Minneapolis, pro se.

Considered and decided by
LANSING, P.J., and RANDALL, and
IRVINE *, JJ., without oral argument.

## OPINION

RANDALL, Judge.

This is an appeal from a jury verdict which found that: (1) appellant James J. Nelson breached a contract for deed by failing to make a cash payment of $19,789.91 to Olive E. Hartz on October 7, 1976; (2) appellant committed legal malpractice when representing the estates of Oscar P. and Olive E. Hartz; and (3) appellant committed acts which evidenced malicious and willful indifference to the rights of the respondents.[1] The jury assessed

$700,000 in punitive damages against appellant. We affirm the jury's verdict in all respects, except the amount of punitive damages assessed. On the issue of punitive damages, we remand to the trial court for a reassessment and the granting of an appropriate remittitur.

## FACTS

### 1. *The contract claim*

On October 7, 1976, Olive E. Hartz and appellant entered into a contract for deed. The contract was drafted by appellant. The contract provided that appellant would pay Mrs. Hartz a total of $50,000 in exchange for a piece of property. According to the terms of the contract, appellant would pay $19,789.81 in cash and the balance would be paid off in monthly installments. Respondents claimed that appellant never made the cash payment required by the contract. Appellant admitted that he did not pay the cash sum, but claimed that he was not obligated to make the payment under the contract.

At trial, respondents introduced a contract for deed into evidence. Appellant admitted the authenticity of this contract, but testified that it was replaced four weeks later by a new contract. Appellant could not produce a copy of the alleged subsequent contract.

### 2. *The malpractice claim*

Appellant was named attorney for the estate of Oscar P. Hartz in 1973. During his representation of the estate, appellant advised Mrs. Hartz to transfer $108,920.90 in nonprobate assets into her own name. These assets were held in survivorship accounts in the names of the decedent, Mrs. Hartz, and respondent. The circumstances surrounding the transfer of these assets

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

1. The respondents in this case are the Olive E. Hartz estate, Shirley J. Arms, the daughter of Oscar P. and Olive E. Hartz and the personal representative of both estates, and Wade Arms, the grandson of Mr. and Mrs. Hartz. Mr. Arms owns the right to receive payments due on the contract for deed. Shirley Arms will be referred to as respondent throughout this opinion.

amounted to a conversion of property which belonged to respondent.[2]

Appellant also drafted Mrs. Hartz's will which was executed on November 7, 1977. Under the terms of the will, appellant became attorney for the estate and was appointed to monitor the trust accounts set up by the will. One of the trust accounts appellant monitored was the account into which he made his contract for deed payments. Respondent was appointed personal representative of the estate by the terms of her mother's will.

As attorney for the estate, appellant filed an estate tax return with the Internal Revenue Service. Respondent cooperated with appellant in preparing this return by providing him with all the necessary information. She also testified that she relied on appellant to discharge his duties in a proper manner and at all times assumed he was doing so.

Respondent became dissatisfied with appellant's representation of the estate in October 1978. Respondent fired appellant in January of 1979. After she fired appellant, respondent prepared and filed a Minnesota inheritance tax return for the estate based on the federal return prepared by appellant.

Respondent then engaged another attorney. This attorney found several errors in the way appellant had handled the estate. Specifically, the attorney found that appellant had: overstated the value of certain assets; failed to take a prior transfer credit[3] which resulted in double taxation of certain assets; and advised Mrs. Hartz to convert all nonprobate assets held jointly with respondent into Mrs. Hartz's own name. As a result of these errors, respondent had to institute a claim against the estate for conversion in probate court. Ap-

pellant opposed respondent's claim in all respects. Despite appellant's opposition, respondent prevailed in her claim in probate court, and was awarded $47,542.77.[4]

Additionally, respondent had to file refund claims for overpayment of taxes due to appellant's errors. Respondent obtained refunds in the amount of $52,886.13 for the estate. However, respondent incurred legal fees of $36,571.52 in pursuit of these refunds.

At trial, respondent introduced expert testimony regarding the errors appellant made on the estate tax returns. The expert's opinion was that the errors could have been avoided if appellant had used a reasonable degree of skill in the practice of his profession and had acted in good faith. The expert further testified that appellant did not use a reasonable degree of skill in preparing the estate taxes, did not act in good faith, and his failure to do so injured respondent.

### 3. *The punitive damages claim*

After appellant was discharged, he contacted a number of government agencies regarding his representation of the Olive E. Hartz estate. All the contacts were without respondent's permission. First, appellant wrote a letter to the Minnesota Commissioner of Securities that falsely accused respondent of taking an improper sales commission on the sale of her mother's home. Second, appellant wrote a letter to the Minnesota State Inheritance Tax Division. This letter falsely accused respondent of understating assets on her tax return. Third, appellant contacted the Internal Revenue Service to offer himself as an informant against respondent. Appellant admits making these contacts. Additional-

2. *In re Estate of Olive E. Hartz,* No. 136293, slip op. at 8–9 (Hennepin County P.Ct. November 7, 1980).

3. Minn.Stat. § 291.06(1) (1978) provided a limited exemption from estate taxation to property which a decedent obtained from a person who died within five years before the death of the decedent. Under the statute, the second estate is given credit for the amount of taxes paid on the transferred property by the first estate. The

purpose of the statute is to avoid the possibility of double taxation.

In this case, Mrs. Hartz's estate contained assets from Mr. Hartz's estate. Mr. and Mrs. Hartz died within five years of each other. Therefore, the assets in Mrs. Hartz's estate that came from Mr. Hartz's estate were entitled to that statutory exemption.

4. *See supra,* note 2, at 10.

ly, as noted above, appellant opposed respondent's claim to recover converted assets in probate court.

As a result of appellant's dealings with the estates of Olive and Oscar Hartz, appellant was suspended from the practice of law and publicly reprimanded.[5] Appellant has never applied for readmission to the bar.

After the jury verdict for respondents, appellant filed motions for judgment notwithstanding the verdict and for a new trial. These motions were denied on January 19, 1988. Judgment in the amount of $792,199.49 was entered against appellant on February 11, 1988.

## ISSUES

1. Did the trial court err by submitting instructions or special verdict questions which contained errors of fundamental law to the jury?

2. Did the trial court err in admitting or excluding evidence?

3. Was the evidence sufficient to support the jury's verdict on each claim against appellant?

4. Was the assessment of $700,000 in punitive damages against the appellant unreasonable or excessive?

## ANALYSIS

### I.

### *Jury Instructions and Special Verdict Form*

Appellant claims that the jury instructions were clearly erroneous, harmful, and prejudicial. Appellant further argues that the special verdict questions were phrased in a manner prejudicial to his case. Respondent correctly points out that appellant failed to object to the jury instructions or

the special verdict questions at trial. Therefore, respondent asserts that any challenge to either the instructions or the content of the special verdict questions has been waived by appellant.

■ According to the Minnesota Supreme Court, jury instructions are subject to appellate review "only if there has been a motion for a new trial in which such matters have been assigned as error." *Sauter v. Wasemiller,* 389 N.W.2d 200, 201 (Minn.1986) (citation omitted). Also, a party's failure to object to the form of a special verdict question prior to the time the question is submitted to the jury constitutes a waiver of any objection that party may have. *Thielbar v. Juenke,* 291 Minn. 129, 137, 189 N.W.2d 493, 498 (1971). However, an appellate court may review jury instructions or the composition of special verdict questions to determine whether there is an error of fundamental law or controlling principle in either. *See Fallin v. Maplewood–North St. Paul School District No. 622,* 362 N.W.2d 318, 320 (Minn. 1985). We have reviewed both the jury instructions and the special verdict questions, and we hold that neither contain errors of fundamental law or controlling principles.

### II.

### *Evidentiary Rulings*

■ Appellant next argues that the trial court committed a number of errors in admitting and excluding certain pieces of evidence. When allegedly inadmissible or prejudicial evidence has been admitted without objection, its admissibility may not be questioned for the first time in a motion for a new trial or on appeal. *See Helm v. El Rehbein & Son, Inc.,* 257 N.W.2d 584, 587 n. 2 (Minn.1977). Similarly, a party

---

**5.** *See In re Nelson,* 327 N.W.2d 576 (Minn.1982). The Minnesota Supreme Court adopted the findings of the referee who concluded that: (1) appellant's failure to advise respondent of her interest in the joint assets caused respondent damages; (2) appellant's drafting of the contract for deed he entered into with Mrs. Hartz and the will with trust provisions making him monitor of his payment obligations violated the con-

flict of interest rules contained in the Code of Professional Responsibility; and (3) appellant's contacts with government agencies and the false allegations he made in the course of those contacts were grave ethical violations made maliciously and without authorization.

A copy of this case was introduced into evidence at trial with no objection from appellant.

who objects to exclusion of evidence must make an offer of proof so the reviewing court may rule on the admissibility of the excluded evidence. *State v. Board of Education*, 277 N.W.2d 524, 528 n. 3 (Minn. 1979); *In re Estate of Ervin*, 399 N.W.2d 200, 203 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. March 18, 1987). Admission or exclusion of evidence is committed to the sound discretion of the trial court. *In re Conservatorship of Torres*, 357 N.W.2d 332, 341 (Minn.1984). Evidentiary rulings may not be the basis for reversal unless that discretion has been clearly abused. *See id.* at 341.

Most of the allegations of error contained in appellant's brief were not properly preserved for appeal. However, appellant did make proper objections and offers of proof on the following items: the testimony of respondents' expert; appellant's financial records for the years 1976 and 1977; appellant's financial records for the years 1972–1987; and an order of the probate court which, appellant claimed, transferred title to the vendor's interest of the contract for deed to the Marquette National Bank. We will review the propriety of the trial court's ruling on each item.

A.  *Expert Testimony*

■ Appellant objected to respondent's expert witness because, appellant contended, the expert served as an advocate in the case. Appellant claimed that the testimony should be barred because the expert acted as an attorney for respondents in an earlier phase of this case. Appellant based his objection on rule 3.7 of the Model Rules of Professional Conduct. That rule prohibits a lawyer from acting as an advocate at a trial in which the lawyer or a lawyer in his firm is likely to be a necessary witness. The trial court ruled that since the expert was not acting as an advocate in *this* case, he could testify without violating the rule. We affirm the trial court's ruling.

B.  *Appellant's Financial Records*

At trial, appellant argued that he did not owe the $19,789 respondents claimed he failed to pay. In support of this argument,

appellant offered into evidence all of his financial records for the years 1976 and 1977. Appellant claimed that these records would prove that he never received the cash sum respondents alleged he owed. Respondents argued that the records could not prove what appellant claimed. Respondents stated that the only thing the records proved was that the cash did not go through these accounts. The trial court sustained respondents' objection on relevancy grounds. We find this relevancy ruling properly within the discretion of the trial court.

Appellant next argues that he should have been allowed to introduce certain receipts he had in sealed envelopes. These receipts covered the years 1972–1987. Appellant argued that these records would support his claim that he purchased certain building materials which he used to repair his building. This evidence, according to appellant, would prove that he, not respondents, expended the cash sum alleged to be due on the contract for deed. Respondents objected to the introduction of these receipts on two grounds, lack of foundation and relevancy. We hold that the trial court properly sustained the objections and excluded the evidence on both grounds.

C.  *Probate Court Order*

■ Appellant claims that he should have been allowed to enter into evidence a probate court order that transferred ownership of the vendor's interest in the contract for deed to the Marquette National Bank. Respondents objected on relevancy grounds and the objection was sustained by the trial judge. This evidence relates to another claim appellant raises in his appeal, that Marquette National Bank should have been joined as the real party in interest pursuant to Minn.R.Civ.P. 17.01. In a pretrial motion, appellant made this same claim and the trial court ruled that all persons with legal or equitable interests in the subject matter of this litigation were parties. This ruling will not be reversed unless it is clearly erroneous. *See Minnesota Education Association v. Indepen-*

*dent School District No. 404*, 287 N.W.2d 666, 668 (Minn.1980).

At trial, an officer of the Marquette National Bank testified that the bank did not accept the oath of trustee on the contract for deed property. He further testified that it is common practice for Marquette Bank to reject appointments as trustee when the property to be held in trust is the subject of current litigation. Based on these facts, we hold that the trial court's ruling, excluding the probate court order and concluding that all persons with legal or equitable interests in the subject property were parties, was a proper exercise of discretion.

## III.

### Sufficiency of the Evidence

On appeal from a jury verdict, an appellate court must view the evidence in the light most favorable to the prevailing party and disturb the verdict only if no reasonable person could find as the jury did. *Remiarz v. Polish American Club*, 270 N.W.2d 289, 290 (Minn.1978) (per curiam). Since the jury rendered verdicts on three separate issues in this case, we will review the sufficiency of the evidence to support each claim.

### A. Breach of the Contract for Deed

The jury found that appellant breached the contract for deed by failing to pay $19,789.81 in cash on October 7, 1976. At trial, respondents introduced into evidence the contract for deed, expert testimony regarding the meaning of the contract for deed, and an admission by appellant that he never made the cash payment. Also, respondent testified that she found no evidence of payment in her mother's records. Appellant testified that he was not obligated to make the cash payment and that the contract for deed entered into evidence by respondents was replaced by a subsequent contract. At trial, appellant could not produce the second contract. To his benefit, the trial court permitted him to testify about the changes allegedly made by the missing second contract.

According to the Minnesota Supreme Court, an "[a]ssesment of witness credibility is the unique function of the factfinder." *Tews v. George A. Hormel & Co.*, 430 N.W.2d 178, 180 (Minn.1988) (citation omitted). The jury's verdict demonstrates that the jury did not believe appellant's testimony regarding a second contract. Findings based on such credibility determinations are not ordinarily disturbed on appeal. *Id.* at 180. We affirm the jury's verdict on the breach of contract claim.

### B. Attorney Malpractice

The elements of a legal malpractice action are: (1) the existence of an attorney-client relationship; (2) acts of negligence or breach of contract; (3) the attorney's acts proximately cause the plaintiff damage; and (4) that but for the attorney's conduct, the plaintiff would have been successful in the underlying action. *Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 281 (Minn.1983) (citations omitted). Plaintiff carries the burden of proving each element to establish a legal malpractice claim. *Id.* at 281–82. Appellant claims that respondents failed to carry this burden. Based on our review of the record, we find sufficient evidence was produced at trial on each element.

### 1. Attorney/Client Relationship

Evidence was produced at trial that demonstrated the existence of an attorney-client relationship between appellant and respondents. Appellant represented the estates of both Oscar and Olive Hartz. He also advised Olive Hartz while she was living and performed numerous legal services for her. That evidence is sufficient to support the existence of an attorney-client relationship between appellant and respondents.

### 2. Breach of Duty

The general rule is that expert testimony is required to establish the standard of care in a legal malpractice action and to establish that the attorney alleged to have been negligent deviated from that standard of care. *See Hill v. Okay Construction Co.,*

312 Minn. 324, 337, 252 N.W.2d 107, 117 (1977). When expert testimony is introduced at trial which demonstrates a breach of the applicable standard of care and based on that evidence the jury concludes that malpractice occurred, the jury's verdict will be upheld. *See Id.* at 336–37, 252 N.W.2d at 117.

Here, respondents' expert testified about the proper standard of care in the preparation of estate tax forms. The expert outlined the procedures generally followed by attorneys who regularly prepare such forms. The expert then gave his opinion that appellant failed to adhere to the proper standard of care when preparing the estate tax forms for the Olive Hartz estate. Additionally, the expert testified that appellant's failure to inform respondent of her interest in the joint tenancy accounts violated appellant's duties. We find respondents submitted sufficient evidence to permit the jury to conclude that appellant breached the applicable standard of care.

### 3. *Causation and Damages*

Respondents' expert testified that appellant's failure to use a reasonable degree of skill when preparing the tax returns caused the respondents damage. Respondent testified to the amount of time and expenditures needed to recover the amounts overpaid due to appellant's errors in preparing the estate tax forms. Evidence also showed the work respondent went through to recover the $47,542.77 appellant advised Olive Hartz to convert. In pursuit of these recoveries, respondent spent $36,571.52 on attorneys fees and $1,398 in court reporter's fees. The trial court found that respondent was entitled to recover these amounts plus interest at the rate of six percent as compensatory damages for appellant's negligence. The total award of compensatory damages was $52,587.52.[6] This amount is supported both by the expert and the other testimony and is affirmed.

6. The jury originally awarded $99,650 in compensatory damages. Pursuant to post-trial motions filed by appellant, the trial judge reduced the amount of compensatory damages to $52,-587.52. A trial judge has the discretion to re-

Respondents are not required to prove the fourth element of the prima facie case because appellant's negligence did not destroy any underlying cause of action respondents may have had. *See Hill,* 312 Minn. at 338, 252 N.W.2d at 117.

### C. *Punitive Damages*

■ Minn.Stat. § 549.20, subd. 1 (1986) provides:

Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Based on the undisputed evidence at trial, appellant contacted government agencies on three separate occasions to falsely accuse respondent of engaging in wrongdoing. He also opposed respondent's conversion claim in probate court. The jury was justified in finding that appellant showed willful indifference to the rights of respondents. We find the evidence sufficient to support an award of punitive damages.

### IV.

#### Amount of Punitive Damages

■ The amount of punitive damages to award is a decision almost exclusively within the province of the jury. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 259 (Minn.1980). The amount of a punitive damage award will not be disturbed on appeal unless the award is so excessive that it is unreasonable. *Id.* at 259. To determine whether an award is unreasonable, a reviewing court must examine the factors set forth in Minn.Stat. § 549.20, subd. 3. *Wilson v. City of Eagan,* 297 N.W.2d 146, 151 (Minn.1980); *Gits v. Norwest Bank Minneapolis,* 390 N.W.2d 835, 838 (Minn.Ct.App.1986).

Minn.Stat. § 549.20, subd. 3 (1986) provides in pertinent part:

duce the amount of damages awarded by a jury if the award is not supported by the evidence. *See Sandt v. Hylen,* 301 Minn. 475, 477, 224 N.W.2d 342, 343 (1974).

Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, * * * the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons * * *.

Based on the factors enumerated in the statute, we hold that the $700,000 amount assessed against appellant is unreasonable and excessive. First, the seriousness of the hazard to the public arising from the appellant's misconduct does not support an award of this magnitude. *See, e.g., Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727 (Minn.1980), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).[7] Appellant's conduct in this case is not like a manufacturer that continues to produce and distribute defective products after discovering their harmful effects. Appellant is an attorney who has been suspended from practice for the same acts which justify the award of punitive damages. Thus, the danger of repetition presented in *Gryc* is not present here.

The second factor, the profitability of the misconduct to the appellant, does not favor the amount of the award. Appellant did not profit from any of the acts which justify assessing punitive damages against him.

The third factor is the duration of the misconduct and whether any attempt was made to conceal it. The conduct that justifies the imposition of the award of punitive damages began in January 1979, with the

letter appellant wrote to the Inheritance Tax Division of the State of Minnesota. The letter contained false accusations against respondent. Next, in February 1979, appellant opposed respondent's conversion claim against Mrs. Hartz's estate. In January 1980, appellant wrote another letter containing false accusations against respondent, this time to the Minnesota Commissioner of Securities. Finally, at some point, appellant contacted the IRS to offer himself as an informant against respondent. The misconduct did cover a modest time span, and, relative to the IRS contact, appellant did make some initial effort to conceal it. However, we find that, as a matter of law, the misconduct here did not reach the threshold needed to sustain a $700,000 punitive damage award.

The next factor to be examined is the attitude and conduct of appellant following the discovery of the misconduct. Appellant has continuously displayed a lack of remorse for his misdeeds and has attempted to justify his conduct. He still asserts in his brief that he acted properly the entire time he represented the estate of Olive Hartz. Appellant even claims that the disciplinary proceedings in which he was suspended from the practice of law were somehow fixed by attorneys from the Lawyers Board of Professional Responsibility. Perhaps this attitude is what motivated the jury to assess such a large amount of punitive damages against appellant. However, the subjective "lack of remorse" does not control our analysis.

The final factors applicable in this case are the financial condition of the appellant and the total effect of other punishment to be imposed upon the appellant as a result of the misconduct. These factors favor reducing the amount of the award. Appellant has been suspended from the practice of law for the same misconduct which is the subject matter of this appeal. We assume that since he has been suspended

---

7. In *Gryc,* the court upheld a $1 million award of punitive damages. Evidence introduced in *Gryc* demonstrated that thousands of people were dying each year due to clothing fires involving highly flammable products such as the

fabric produced by the defendant. Therefore, the court held that the $1 million amount was not excessive in light of the serious hazard caused by the defendant's conduct. *Gryc,* 297 N.W.2d at 739, 741.

from the practice of law, his income has dropped, but we note the lack of evidence in the record of appellant's current financial condition. Appellant has also been found liable to respondents for legal malpractice. The trial court awarded respondents $52,587.52 in compensatory damages on this claim. The total effect of these punishments—suspension from the practice of law and the compensatory damage award for legal malpractice—mitigates in favor of reducing the punitive damage award.

While awards of punitive damages are generally within the province of the jury, the "open-ended and volatile nature of punitive damages" requires a reviewing court to exercise close control over the imposition and assessment of the award. *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 835 (Minn.1988), *pet. for cert. filed* (Oct. 14, 1988) (citation omitted). The *Hodder* court stated that in determining whether an award of punitive damages is excessive, "we look for proportionality between the egregious misconduct and the amount of damages." *Id.* at 837. Having examined the factors set forth in the statute, we find proportionality lacking in this case. Specifically, the factors which justly bear upon the purpose of punitive damages such as the hazard to the public, the profitability of the misconduct, and the total effect of other punishment, do not support the award of $700,000. Additionally, there is no evidence in the record of appellant's financial condition. The failure to take such evidence may have led to the excessive punitive damages assessment. We reverse the award of $700,000 and remand this case to the trial court with the instruction that the court grant a remittitur on the amount of punitive damages assessed by the jury. In making this reduction, the trial court should consider appellant's current financial condition in addition to the other factors enumerated in the statute.

## DECISION

The trial court did not submit instructions or special verdict questions which contained errors of fundamental law to the jury. The trial court did not err by making

the evidentiary rulings challenged by appellant. Sufficient evidence is contained in the record to support the jury verdict on each claim against appellant. The assessment of punitive damages against appellant was proper, but the amount granted was unreasonable and excessive. We reverse and remand for reconsideration on the amount of puntive damages.

Affirmed in part, reversed in part, and remanded.