Wendy BRADLEY, Respondent,

v.

HUBBARD BROADCASTING, INC., Appellant,

and

State of Minnesota by Stephen W. Cooper, Commissioner, Department of Human Rights, Intervenor, Respondent.

No. C9–90–1911.

Court of Appeals of Minnesota.

June 4, 1991.

Review Denied Aug. 2, 1991.

672

Donald E. Horton, Sonja R. Peterson, Horton and Associates, Minneapolis, for respondent.

Charles A. Mays, Susan M. Robiner, Leonard, Street and Deinard, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Andrea Mitau Kircher, Sp. Asst. Atty. Gen., Richard L. Varco, Jr., Asst. Atty. Gen., St. Paul, for intervenor, respondent.

Considered and decided by DAVIES, P.J., and LANSING, and CRIPPEN, JJ.

## OPINION

LANSING, Judge.

In this employment defamation and reprisal discrimination action, the jury and the trial court awarded compensatory and punitive damages and the trial court assessed a civil penalty. The employer challenges the jury's basis for finding defamation and an implied covenant of good faith and fair dealing, the trial court's finding of reprisal discrimination, and the amount and propriety of compensatory and punitive damages. We affirm all issues of liability except breach of the implied covenant, but modify the punitive damages award.

## FACTS

After being discharged, Wendy Bradley sued her former employer, Hubbard Broadcasting, Inc. (HBI), alleging defamation; breach of an implied covenant of good faith and fair dealing; promissory estoppel; and sex, marital status, and reprisal discrimination. Her first three claims were tried to a jury, which found that Bradley was defamed by her supervisor's false, malicious statements about the incident leading to Bradley's discharge.

The incident began when Bradley noticed scraps of paper with her name on them while cleaning a table near a photocopier. Pieced together, the scraps formed a memo outlining her supervisor's intent to replace Bradley and noting Bradley's involvement in two disputes between HBI and other employees. Bradley showed the memo to a coworker.

When the supervisor learned of Bradley's actions, she fired Bradley and sent a memo to the finance department claiming that "Ms. Bradley retrieved a piece of personal correspondence from my waste bin."

Upper-level managers were told that Bradley was discharged for "gross misconduct."

The jury also found that Bradley's discharge breached an implied covenant of good faith and fair dealing in her employment contract but rejected the promissory estoppel claim. The jury awarded Bradley $12,000 in compensatory damages and $500,000 in punitive damages.

Bradley's claims of sex, marital status and reprisal discrimination were tried simultaneously to the trial court. Before her discharge, Bradley participated in investigations of two legal disputes between HBI and other employees. After cooperating with the Minnesota Human Rights Department's investigation of a coworker's allegations of discrimination and sexual harassment, Bradley was denied a promotion and encountered communication problems with her coworkers. She requested and received a transfer to another department, where she later participated in an investigation of a job-posting dispute. Bradley's supervisor encouraged her to leave her job, but Bradley refused.

The court concluded that Bradley had been subjected to reprisal discrimination but denied her other claims. After reducing the duplicative $12,000 jury award of compensatory damages to $1,000, the court awarded compensatory damages totalling $46,180.80, including treble damages for lost earnings ($34,560), lost insurance benefits ($1,620), and emotional distress ($10,000). The court also assessed punitive damages of $6,000 and a $200,000 civil penalty against HBI.[1]

### ISSUES

1. Does the evidence support a finding of defamation by an employer's false, malicious statements that an employee retrieved personal correspondence from a supervisor's wastebasket and was fired for gross misconduct?

2. Was the evidence sufficient as a matter of law to imply a covenant of good faith and fair dealing into an at-will employment contract?

3. Did misconduct of counsel and admission of testimony on a sexual harassment investigation require a new trial?

4. Was evidence of a continued pattern of adverse employment actions sufficient to support a finding of reprisal discrimination?

5. Were the damages awarded by the trial court and jury contrary to the evidence or excessive as a matter of law?

### ANALYSIS

#### I

Defamation actions arising from communications made in a private employment setting are analyzed under Minnesota common law, which makes no distinction between statements of "fact" and "opinion." *See Weissman v. Sri Lanka Curry House, Inc.*, 469 N.W.2d 471 (Minn.App. 1991); *see also Milkovich v. Lorain Journal Co.*, —— U.S. ——, ——, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990) (rejecting an absolute constitutional privilege for statements of "opinion"). Accusations that Bradley retrieved personal correspondence from a supervisor's wastebasket and was fired for gross misconduct were sufficiently harmful to Bradley's reputation to support a defamation action. *See Weissman*, 469 N.W.2d at 473.

The evidence supports the jury's findings that: (1) the supervisor's statements were communicated to someone other than Bradley; (2) the statements were false; and (3) the statements tended to harm Bradley's reputation. *See Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 886 (Minn.1986). We cannot conclude that the supervisor's inconsistent testimony was more credible than Bradley's testimony. *See Wirig v. Kinney Shoe Corp.*, 448 N.W.2d 526, 533 (Minn. App.1989) (the jury must assess the credibility of the witnesses and assign the weight to be given to their testimony),

---

**1.** The trial court originally awarded punitive damages of $8,500. By agreement of the parties, the award was amended to the $6,000 statutory limit applicable when Bradley brought her claim in 1986. Minn.Stat. § 363.071, subd. 2 (1986).

*rev'd on other grounds,* 461 N.W.2d 374 (Minn.1990).

Even if revealing the contents of the memo to a coworker constituted gross misconduct, *see Henderson v. Huecker,* 744 F.2d 640, 644 (8th Cir.1984), the evidence did not compel the finding that the statement that Bradley was fired for gross misconduct was true. Dissemination of the memo was not the sole reason given for Bradley's discharge. The supervisor's memo itself provides an alternative basis:

> *Secretary:* Wendy Bradley, not a good asset to the department. Single mother of two, she will be a little tough to eliminate. Wendy has been in the middle of two legal disputes within the company regarding the termination, etc., of other employees. I am building the appropriate file and [would] like to replace her with a top notch secretary, possibly one from [within the] building.

The supervisor's expressed intent to replace Bradley after "building the appropriate file" and emphasis on Bradley's participation in investigations of other employee's complaints provides evidence from which the jury could readily conclude that Bradley was terminated for reasons other than gross misconduct.

■ Although an employer's nonmalicious communications are conditionally privileged, *see Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256–57 (Minn.1980), the jury found that the supervisor's statements were made with actual malice, defeating the privilege. After Bradley declined to resign voluntarily, the supervisor became noncommunicative and, according to her memo, began "building the appropriate file" to replace Bradley. The supervisor, without investigation, *see Wirig,* 461 N.W.2d at 380, accused Bradley of retrieving the memo from her wastebasket and caused the allegation of gross misconduct to circulate as office gossip. This conduct supports the jury's conclusion that the supervisor harbored an improper motive or acted causelessly and wantonly for the purpose of injuring Bradley. *See Harvet v. Unity Medical Center, Inc.,* 428 N.W.2d 574, 579 (Minn.App.1988).

## II

■ Bradley's breach of an implied covenant claim is premised on in-house counsel's oral assurances that HBI would not retaliate against her for participating in the sexual harassment investigation of a coworker's complaint. The evidence of these assurances, taken as true, is not legally adequate to support this claim.

Minnesota courts have consistently declined to read a good faith and fair dealing covenant into employment contracts. *See Hunt v. IBM Mid America Employees Fed. Credit Union,* 384 N.W.2d 853, 858 (Minn.1986). Oral nonretaliation assurances, made before Bradley signed an agreement continuing her employment as "at-will with 2 weeks notice," were legally insufficient to modify the parties' at-will employment contract to require good faith discharge. Disallowing this claim does not alter Bradley's compensable damages. The jury's award of damages of $11,000 was previously stricken as a duplication of the compensatory damages allowed on the reprisal discrimination claim.

## III

■ HBI identifies, as reversible error, two trial rulings cited in its new trial motion. The first ruling permitted Bradley's testimony on her coworker's human rights complaint. HBI contends this evidence was highly prejudicial and confusing, thus inadmissible under Minn.R.Evid. 403. The evidence, although graphic, was not extensive. Bradley summarized the actions leading to the sexual harassment and sex discrimination claim. The trial court admitted the evidence because it "tended to explain Bradley's fear for her job" and related to the contract claims. Although the evidence is of marginal relevance, we cannot say that the trial court abused its discretion in denying a new trial because of its admission.

■ In the second ruling, the trial court refused to grant a new trial for misconduct of counsel. Undeniably, Bradley's attorney made strong statements about Bradley's supervisor, her testimony, and

the conduct of HBI's attorney. To warrant a new trial, however, misconduct by trial counsel must be severe, have an impact on the jury, and clearly result in prejudice. *See Eklund v. Lund,* 301 Minn. 359, 362, 222 N.W.2d 348, 350 (1974).

The trial court's curative instruction, although not so strong as HBI requested, cautioned the jury to disregard counsel's attack on a party or opposing counsel and also to disregard attorney's statements on personal belief of credibility. Because this instruction negated any undue prejudice, the trial court did not abuse its discretion by denying a new trial.

## IV

The trial court concluded that Bradley established a prima facie case of reprisal discrimination under Minn.Stat. § 363.03, subd. 7 (1986), by showing: (1) she participated in a protected activity by cooperating as a witness in an investigation of a claim brought under the Minnesota Human Rights Act; (2) she was subjected to reprisal discrimination consisting of a demotion in job status, loss of a promotion, poor working conditions, and eventual discharge; and (3) HBI's reasons for the actions were pretext. *See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983).

■■■■ Bradley met her burden of showing that reprisal was a "discernible, discriminating, and causative factor" in HBI's adverse employment actions. *See Anderson v. Hunter, Keith, Marshall and Co.,* 417 N.W.2d 619, 627 (Minn.1988) (defining burden of proof under three-part analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). HBI may not escape liability by proving the discharge would have taken place even in the absence of protected activity. *See id.* at 626–27.

The trial court found at least eight specific acts to be reprisal discrimination. Even though HBI presented evidence of nondiscriminatory motives for some of the actions, including Bradley's distribution of the confidential memo, Bradley's opening mail intended for other staff members, and

lack of qualification for the promotion, the ultimate determination is a fact issue for the trial court, and considerable evidence supports the court's finding that these asserted reasons were pretext.

The supporting evidence includes HBI telling Bradley she was overqualified for her job and should leave, noncommunicative behavior toward Bradley, and the memo, which evinces intent to terminate Bradley and, in the next sentence, states she has "been in the middle of two legal disputes with the company regarding the termination of other employees." These actions followed within two months the conclusion of the coworker's human rights investigation. The record and the trial court's findings amply support the conclusions that Bradley established a prima facie case of reprisal and that HBI's rationale for its actions was pretext.

■■■■ HBI disputes that the actions that the court found to be reprisal, except for the termination, occurred within the applicable 300–day limitation period preceding the filing of Bradley's human rights complaint. *See* Minn.Stat. § 363.06, subd. 3 (1986). The trial court found that the demotion in job status, loss of promotion, and poor working conditions were part of a series of related violations leading to Bradley's termination within the statutory time period. The court concluded that because the acts were continuing, they were not barred by the 300–day limitation. *See Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 979–82 (5th Cir.1983); *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241, 249 (5th Cir.1980). The trial court's findings satisfy the *Berry* standards of recurring, similar discrimination in which the complainant acted to preserve her rights. Bradley's retention of an attorney and notifying HBI's counsel of the earlier actions were reasonable preservation actions. The trial court did not err in considering the related actions that preceded the 300–day period.

## V

HBI raises four separate issues on damages: (1) insufficiency of the evidence to

support emotional distress damages; (2) impropriety of punitive damages based on a defamation action arising from an intracorporate publication; (3) impermissible double recovery of compensatory and punitive damages for defamation, breach of implied covenant, and reprisal discrimination damage; and (4) unconstitutionality and excessiveness of punitive damages.

### (1)

 The jury awarded Bradley $1,000 for embarrassment, pain, and emotional distress on her defamation claim, and the trial court awarded Bradley $10,000 for embarrassment and emotional distress suffered because of the reprisal discrimination. HBI's argument that Bradley has not shown a level of emotional distress necessary to recover damages is predicated on the degree of proof necessary to maintain a separate cause of action for infliction of emotional distress. At issue here, however, is an element of damages, not a cause of action. When an individual has been defamed, the jury may award compensation for emotional distress as an element of damages. *See State Farm Mutual Auto. Ins. Co. v. Village of Isle*, 265 Minn. 360, 367–68, 122 N.W.2d 36, 41 (1963); *Meyer v. Tenvoorde Motor Co.*, 714 F.Supp. 991, 996 (D.Minn.1989). Bradley's evidence of inability to sleep, headaches, anger, and despair is sufficient to support the jury's award of $1,000 in damages for embarrassment, pain, and emotional distress.

 Minn.Stat. § 363.071, subd. 2, specifically permits the trial court to award damages for mental anguish or suffering caused by reprisal discrimination. Mental anguish need not be severe or accompanied by physical injury. *See State by Cooper v. Mower County Social Services*, 434 N.W.2d 494, 499–500 (Minn.App.1989). Bradley's extensive testimony of her diminished sense of self-worth and the deterioration of her relationship with her children meets the statutory requirements and supports the judge's discretionary award.

### (2)

 HBI contends that punitive damages are not recoverable for intracorporate defamation because it was not a recognized cause of action when HBI made the statements. *See Lewis*, 389 N.W.2d at 892 (Minn.Stat. § 549.20 should not be read to extend punitive damages to newly recognized causes of action). We agree with the trial court's holding that Minnesota courts recognized an action for defamation by intracorporate publication well before HBI's statements defaming Bradley. *See McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 235 N.W.2d 371 (1975); *Otto v. Charles T. Miller Hosp.*, 262 Minn. 408, 115 N.W.2d 36 (1962).

### (3)

 HBI's defamatory statements and reprisal discrimination occurred during the same time period. This proximity alone does not compel a finding of double recovery. Double recovery occurs when separate theories of liability are premised on the same harm. *See Wirig*, 461 N.W.2d at 379. The reprisal harm flows from HBI's punishment of Bradley for participation in a human rights investigation. If Bradley had been fired for this alone, without the accompanying defamatory statements, the harm would be different in kind and degree from the harm that flowed from the defamatory statements.

Further, the trial court did not include the defamatory statements in the list of reprisal actions. The last reprisal act was termination. The jury found that actionable defamation occurred when HBI characterized and published Bradley's actions as gross misconduct. These statements were made after Bradley was terminated. Although factually intertwined, the harms are sequential and sufficiently discrete to support separate compensatory awards.[2]

 Whether the punitive damages are duplicative is more problematic. The trial court awarded $6,000 in punitive dam-

---

**2.** We also note that the trial court struck the repetitious compensation for lost wages, leaving

no overlapping compensatory damages.

ages on the reprisal discrimination claim and, under Minn.Stat. § 363.071, subd. 2 (1990), $200,000 as a civil penalty. We recognize that a civil penalty is intended to supplement compensatory and punitive damages and find no duplication between the civil penalty and the $6,000 punitive damages awarded under the Human Rights Act. However, for a number of reasons, we conclude that there is duplication between the Human Rights Act penalties and the punitive damages awarded by the jury on the defamation claim.

First, although the civil penalty is paid to the state rather than the claimant, the same factors are taken into account: the seriousness and extent of the violation; the public harm caused by the violation; whether the violation was intentional; and the financial resources of the respondent.

Second, the jury's punitive damages award was likely premised on misconduct in addition to the defamation. The reprisal and discrimination claims arose from a continuous course of interrelated events and were tried together, despite HBI's objection. As a result, the jury heard evidence outside the permissible scope of its consideration. The trial court did not instruct the jury to disregard evidence of human rights offenses when assessing punitive damages, broadly wording the special verdict question to inquire:

> What amount of punitive damages will serve to punish Hubbard Broadcasting and deter it and others from similar conduct?

It is highly unlikely that the jury considered only the defamation in awarding $500,000 for punitive damages.

Third, the jury was not told of the "other punishment likely to be imposed" on HBI as part of the reprisal discrimination claim.

*See* Minn.Stat. § 549.20, subd. 3. Our conclusion that the penalties are duplicative factors into the remaining question of whether the punitive damages are excessive.

(4)

Justice Blackmun observed in *Pacific Mutual Life Ins. Co. v. Haslip,* —— U.S. ——, ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), that "punitive damages have long been a part of traditional state tort law." In assessing punitive damages, the jury is instructed, under statutory or common law standards, to consider the gravity of the wrong and the need to deter the harmful conduct. Due process is satisfied if the standards are sufficiently definite and the punitive damages award is not grossly out of proportion to the severity of the offense. *Id.* Minnesota's eight-factor measure of punitive damages is significantly more detailed than the Alabama statute that passed scrutiny in *Pacific Mutual.*[3]

In 1990 the legislature added subdivision 5 to Minn.Stat. § 549.20 to permit greater trial and appellate court scrutiny of punitive damages, codifying a judicial trend toward expanded supervisory review of jury-imposed punitive damages. *See, e.g., Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826 (Minn.1988) (reducing $12.5 million punitive damages award to $4 million), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989); *Stanger v. Gordon,* 309 Minn. 215, 244 N.W.2d 628 (1976) (reducing $12,900 punitive damages award to $7,500); *Estate of Hartz v. Nelson,* 437 N.W.2d 749 (Minn.App.1989) (reversing excessive punitive damages award of $700,000 and remanding for reconsideration), *pet. for rev. denied* (Minn. July 12, 1989); *Evans v. Blesi,* 345 N.W.2d 775

---

**3.** Minn.Stat. § 549.20, subd. 3 (1990), provides:
 Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

(Minn.App.1984) (reducing $500,000 punitive damages award to $250,000). Although Bradley's cause of action arose before the amendment's effective date, these cases establish that because of the open-ended and volatile nature of punitive damages, appellate courts must exercise "close control over the imposition and assessment of punitive damages." *Hodder*, 426 N.W.2d at 835 (quoting *Lewis*, 389 N.W.2d at 892); *see generally* American College of Trial Lawyers, *Report on Punitive Damages of the Comm. on Special Problems in the Administration of Justice* (1989) (recognizing judicial and legislative trends toward restricting punitive damage awards and advocating strict standards and heightened judicial supervision).

Applying the factors listed in Minn.Stat. § 549.20, subd. 3, we find support for punitive damages: (1) Hubbard Broadcasting is a statewide broadcasting operation licensed in the public interest. Discharging employees for defamatory reasons results not only in the loss of the employee's present job, but may affect future work opportunities, and destroy work-place equity; (2) Defaming and discharging an employee for cooperation with human rights investigations can be profitable by suppressing claims of other human rights violations; (3) HBI's conduct relating to Bradley took place over a year's period and was characterized by acts of concealment; (4) High level employees, including HBI's in-house counsel and Bradley's supervisor, a part owner of HBI, were involved in the misconduct. Both were aware of Bradley's vulnerable economic position as the single parent of two children. The discharge, after a job status demotion, promotion loss, and difficult working conditions, struck at the emotional and financial base of Bradley's life; (5) HBI's attitude and conduct upon discovery did not change. Bradley's supervisor did not investigate Bradley's account of how she obtained the memo or take steps to remedy any damage; (6) Although the evidence does not suggest the involvement of a large number of employees, those involved were top-level employees; (7) The jury considered the net worth of HBI, a multimillion-dollar broadcasting company; but (8) The total effect of other penalties was not taken into account.

Although these factors justify punitive damages, the amount, $500,000, was arrived at by the jury after a trial in which the volume of evidence on the reprisal and discrimination claims greatly overshadowed the evidence on the defamation claim. HBI's pretrial motion to limit the evidence to the defamation claim was denied, and the jury was not cautioned to separate the claims, even though the punitive damages on the reprisal claim, limited to $6,000, was tried before the judge and not the jury. The jury's award on the defamation claim—$12,000 in compensatory damage and $0 for damage to reputation—demonstrates the influence of factors beyond defamation in its $500,000 punitive damage award. In addition, the jury was unaware that an additional civil penalty of $200,000 would be imposed for HBI's reprisal actions.

Because a new trial is unnecessary on any other issue, we conclude, as did the appellate courts in *Hodder, Stanger, Evans,* and *Hartz*, that justice is better served by reducing the punitive damages to an amount more proportional to the egregiousness of the misconduct, keeping in mind those factors which justly relate to the purposes of punitive damages. *Hodder*, 426 N.W.2d at 837. Accordingly, we reduce the jury's award of punitive damages from $500,000 to $100,000.

### DECISION

Affirmed in part and reversed in part.

CRIPPEN, Judge (dissenting):

1. Defamation damages.

For more than a decade punitive damage awards have been specially scrutinized in Minnesota. Not until today, however, has an appellate court simply substituted its judgment for a jury's finding of fact on the measure of punitive damages.[1]

**1.** In *Stanger v. Gordon*, 309 Minn. 215, 222, 244 N.W.2d 628, 632 (1976), the supreme court,

No doubt an award of punitive damages has characteristics of open-endedness and volatility. *See Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 835 (Minn. 1988), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). Thus, the Minnesota Legislature determined in 1978 that punitive damages are permissible only when "the acts of the defendant show a willful indifference to the rights or safety of others." 1978 Minn.Laws ch. 738, § 4 (codified at Minn.Stat. § 549.20, subd. 1(a) (1978)).[2] In addition, this circumstance must be proven by clear and convincing evidence. *Id.* The purpose of punitive damages is "to punish and deter" this conduct, *Hodder*, 426 N.W.2d at 837, and the 1978 legislation mandated that punitive damages be measured by the statutory factors bearing on this purpose. 1978 Minn.Laws ch. 738, § 4 (codified at Minn. Stat. § 549.20, subd. 3 (1978)). These legislative enactments were aimed at limiting the frequency and amounts of punitive damage awards. *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876, 891 (Minn.1986). With the same cautious spirit, the imposition of these awards is to be closely controlled by judges. *Hodder*, 426 N.W.2d at 835. To achieve this goal of awards that reflect "proportionality between the egregious misconduct and the amount of damages," it is appropriate on our part to adjust for mistaken notions of the jury which are properly demonstrated. *Id.* at 837.

Here, no mistakes are evident. The topic on appeal is solely an alleged excess in the award. In this respect, "we will not dis-turb the award on appeal unless it is so excessive as to be unreasonable." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 259 (Minn.1980). In my opinion, our decision here begins and ends with a vital maxim of Minnesota law:

> The law is well settled in this jurisdiction that in examining a verdict on appeal the evidence must be considered in the light most favorable to the prevailing party and the verdict must be sustained if it is possible to do so on any reasonable theory of evidence.

*Carpenter v. Mattison*, 300 Minn. 273, 276, 219 N.W.2d 625, 628–29 (1974).

It is undisputed that the trial court properly instructed the jury on the measure of punitive damages, focusing on the standards prescribed in the governing statute. Taking into account the statutory factors, there is ample evidence to sustain the jury's measure of damages. Defamation of character as a condition of employment is unacceptable to Minnesota citizens, especially when committed by highly visible employers. As in this instance, the practice falsely justifies employment decisions the employer deems important for the profitable operation of its business. Concealing the real facts is characteristic of defamation and especially characteristic of the employer's conduct here. The defamation in this case was perpetrated by high level employees, making the corporation fully aware of its own abusive act. The jury properly took into account the net worth of the appellant corporation.

According to the governing statute, the factfinder also must consider the effect of

---

mindful that it was "intruding on a function addressed almost entirely to the trial judge's discretion," reduced an award by $5400 to correct observable effects of prejudicial misconduct by plaintiff's counsel; the remaining award of $7500 equaled the amount plaintiff had asked the jury to award. In *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 835–37 (Minn. 1988), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989), the court premised a damage award reduction on substantial, observable mistakes in the rationale employed by the jury. In *Evans v. Blesi*, 345 N.W.2d 775, 780 (Minn.App.1984) this court halved a punitive damage award but expressly in deference to the wishes of the trial court judge who evaluated the issue after the case had been appealed. Fi-nally, in *Estate of Hartz v. Nelson*, 437 N.W.2d 749, 755–57 (Minn.App.1989), *pet. for rev. denied* (Minn. July 12, 1989) this court remanded a punitive damages award. *Hartz* may be a precursor of our decision today, in that it specifically determines an award was excessive; however, the error demonstrated in *Hartz* is unique, involving, *inter alia*, an individual defendant and a record which includes no evidence as to the defendant's financial resources.

2. The standard was recently modified to substitute "deliberate disregard" for "willful indifference." 1990 Minn.Laws, ch. 555, § 15 (amending Minn.Stat. § 549.20, subd. 1 (1988)).

other punishment likely to be imposed upon the defendant "as a result of the misconduct." Minn.Stat. § 549.20, subd. 3 (1988). The only misconduct considered by the jury was a group of alleged defamatory statements. Appellant encountered no other punishment as a result of the defamation.

### 2. Extraneous considerations?

The preceding analysis is conditional, dependent on our judgment that the jury did not mistakenly consider human rights offenses while assessing punitive damages for tortious defamation. The record does not permit a conclusion this mistake occurred.

It is fundamental in this regard that neither party has challenged on appeal the verdict form submitted to the jury or the employment of a single trial proceeding on fact issues both for the jury and the trial judge.[3] More particularly, neither party disputes that this document properly posed a question of punitive damages specifically needed to punish and deter appellant for its defamation.[4] In addition, nothing in the trial court's instructions permitted the jury to mix into the statutory punitive damage factors any considerations regarding earlier misconduct that led to the termination of respondent's employment. No additional cautionary or clarifying instructions were requested. Nothing in the instructions or the verdict form invited the jury to measure punitive damages by looking beyond defamatory statements to consider other conduct evidencing appellant's state of mind.

### 3. Human rights penalty.

I share with the majority a concern for the fact that appellant was penalized for two acts that occurred consecutively in ap-

pellant's dealings with a single employee. In the final analysis, however, the record demonstrates that each of the penalties was separately determined on a separate set of facts. There was not a double recovery.

As already observed, the jury's punitive damage award was specifically premised on the use of defamatory statements demonstrating willful indifference to the rights of respondent. In a wholly separate decision, the trial judge determined penalties for discriminatory conduct with disciplined regard for standards governing Minnesota Human Rights Act violations. In sum, two violations occurred, and each was separately penalized.

I respectfully dissent from the decision to alter the jury's verdict.

---

3. The admission of evidence on a discrimination claim of employee Marcea Mariana, one element of the case decided by the trial judge, is raised as an issue on appeal. This evidence was also relevant to issues before the jury and I share the conclusion of the majority that admission of the evidence did not constitute reversible error.

4. Section C of the verdict form, including questions 9 through 21, is entitled "DEFAMATION." Question 19 asks for determination of compensatory damages for defamatory statements. Question 20 asks whether specified statements,

each addressed separately, demonstrate a willful indifference on the part of appellant to the rights of others. Question 21 asks what amount of punitive damages needed to punish and deter appellant and others "from similar conduct." The jury was told to answer question 21 only if it answered yes to any subpart of question 20. The verdict form instructed the jury that it could not award punitive damages on other subjects of its verdict, namely, promissory estoppel and breach of implied covenant of good faith and fair dealing.